No. 18-916C
(Senior Judge Firestone)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

CAPITOL INDEMNITY CORP.,
Plaintiff,

v.

THE UNITED STATES,
Defendant.

---

**DEFENDANT'S MOTION TO DISMISS WITH APPENDIX**

---

JOSEPH H. HUNT
Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

DEBORAH A. BYNUM
Assistant Director

DANIEL K. GREENE
OF COUNSEL:                       Trial Attorney
                                  Commercial Litigation Branch
Major Adrian Allison             Civil Division
General Litigation Branch         United States Department Of Justice
United States Army Legal Services Agency   PO Box 480, Ben Franklin Station
United States Army                Washington, D.C. 20044
                                  Tel: (202) 616-0342
                                  Fax: (202) 514-8624
                                  Daniel.K.Greene@usdoj.gov

Dated: October 26, 2018           *Attorneys for Defendant*

## **TABLE OF CONTENTS**

QUESTIONS PRESENTED ........................................................................................ 1

STATEMENT OF THE CASE .................................................................................... 1

I.      The Original Contract ................................................................................ 2

II.     The Takeover Agreement And The Completion Contract................................. 3

III.    Capitol's Certified Claim ........................................................................... 4

IV.    The Claims Asserted In The Complaint............................................................ 6

ARGUMENT ............................................................................................................. 7

I.      Standard Of Review ................................................................................... 8

II.     The Court Lacks Jurisdiction To Entertain Capitol's Claim To Pre-Default Payments
The Government Made To Redstick .................................................................. 8

III.    The Court Should Dismiss Capitol's Claims For Equitable Adjustments........................ 10

       A.     The Court Lacks Jurisdiction To Entertain These Claims Because They Arose
Before Capitol Was In Privity Of Contract With The Government .................... 11

       B.     These Claims Should Be Dismissed Pursuant To Rule 12(b)(6) Because
Even The Most Generous Reading Of The Pleadings Fails To Establish
The Elements Of FAR Part 52.243-4 .................................................. 13

CONCLUSION ......................................................................................................... 14

i

## <u>APPENDIX TABLE OF CONTENTS</u>

Excerpts from Contract No. W91151-16-C-0042 (June 1, 2016)..........................................Appx1

Modification of Contract No. W91151-16-C-0042 (Sept. 30, 2016) ..................................Appx50

## **TABLE OF AUTHORITIES**

**Cases**

*Brocade Commc'n Sys. v. United States,*
  120 Fed. Cl. 73 (2015) ........................................................................... 8, 9

*Doe v. United States,*
  106 Fed. Cl. 118 (2012) ............................................................................. 8

*Fireman's Fund Ins. Co. v. England,*
  313 F.3d 1344 (Fed. Cir. 2002)................................................................ 12

*Fireman's Fund Ins. Co. v. United States,*
  909 F.2d 495 (Fed. Cir. 1990)................................................................. 10

*Huntington Promotional & Supply, LLC v. United States,*
  114 Fed. Cl. 760 (2014) ............................................................................. 8

*Insurance Co. of the West v. United States,*
  243 F.3d 1367 (Fed. Cir. 2001)............................................................... 10

*Insurance Co. of the West v. United States,*
  100 Fed. Cl. 58 (2011) ............................................................................. 12

*Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin.,*
  525 F.3d 1299 (Fed. Cir. 2008)................................................................. 8

*K-Con Bldg. Sys., Inc. v. United States,*
  778 F.3d 1000 (Fed. Cir. 2015)......................................................... 13, 14

*Lumbermens Mut. Cas. Co. v. United States,*
  654 F.3d 1305 (Fed. Cir. 2011)............................................................. 9, 10

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998)..................................................................................... 8

*Tuftco v. United States,*
  614 F.2d 740 (Ct. Cl. 1980) ..................................................................... 12

*United Pac. Ins. Co. v. Roche,*
  380 F.3d 1352 (Fed. Cir. 2004)..................................................... 10, 11, 13

**Statutes**

28 U.S.C. § 1491(a) ................................................................................................ 8

31 U.S.C. §§ 3727(a)(1), (b) .................................................................................. 12

41 U.S.C. § 15(a) ................................................................................................... 11

41 U.S.C. § 7103(a)(1) ........................................................................................... 11

**Rules**

RCFC 12(b)(1) ......................................................................................................... 8

RCFC 12(b)(6) .................................................................................................. 8, 14

**Regulations**

48 C.F.R. § 32.502-4 ............................................................................................... 2

48 C.F.R. § 52.232-16 ............................................................................................. 2

48 C.F.R. § 52.232-5(b) ........................................................................................... 2

48 C.F.R. § 52.243-4(b) ...................................................................................... 7, 13

48 C.F.R. § 52.243-4(d) ........................................................................................ 13

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CAPITOL INDEMNITY CORP.,           )
                                   )
            Plaintiff,             )
                                   )     No. 18-916C
        v.                         )     Senior Judge Firestone
                                   )
THE UNITED STATES,                 )
                                   )
            Defendant.             )

## DEFENDANT'S MOTION TO DISMISS WITH APPENDIX

Defendant, the United States, respectfully requests that the Court dismiss pursuant to RCFC 12(b)(1) and 12(b)(6) the complaint filed by the plaintiff, Capitol Indemnity Corporation (Capitol).  In support of this motion, we rely upon the complaint, the documents appended to the complaint, and the appendix.

## QUESTIONS PRESENTED

1.      Whether the Court possesses jurisdiction to entertain a claim by Capitol, a surety, for damages corresponding to payments the Government made to Redstick, Incorporated (Redstick) before it defaulted on its contract.

2.      Whether the Court possesses jurisdiction to entertain Capitol's claims for equitable adjustments to the price of the contract to Redstick when those claims arose before Capitol was in privity of contract with the Government.

3.      Whether Capitol's claims for equitable adjustments should be dismissed pursuant to RCFC 12(b)(6) because the allegations in the complaint and the reasonable inferences drawn therefrom fail to establish all the elements of its claims.

## STATEMENT OF THE CASE

Capitol issued performance and payments bonds to Redstick in connection with the

Army's award to Redstick of contract no. W91151-14-C-0061, a fixed-price contract to renovate

a fitness facility located at Fort Hood, Texas (the "original contract").  The Government

terminated the original contract for default and thereafter called upon Capitol to complete the

work.  Capitol asserts a claim for damages corresponding to pre-default progress payments the

Government made to Redstick and two claims for equitable adjustments to the price of the

original contract.

## I.    The Original Contract

On September 27, 2014, the Department of the Army awarded the original contract to

Redstick.  Compl. ¶ 4.  The price at the time of award was $1,945,694.00, which increased to

$2,307,898.53 after the contract was modified.  *Id.* ¶¶ 4, 6.  The original contract required the

Government to make monthly progress payments to Redstick based on "estimates of work

accomplished which meets the standards of quality established under the contract, as approved

by the contracting officer."  48 C.F.R. § 52.232-5(b) (quoted in Compl. ¶ 7).  The original

contract included FAR part 52.232-16, which provided that the contracting officer "may" reduce

or suspend payments when a contractor was delinquent in paying its subcontractors and that no

single progress payment was authorized for more than 80% of the contract value.  48 C.F.R.

§§ 52.232-16(a)(6), (c) (quoted-in-part in Compl. ¶ 7).  As the contracting officer explained,

FAR part 52.232-16 applies to contracts requiring progress payments based on costs incurred,

not on amount of work completed, and thus, this provision should not have been included in the

original contract. Compl. ¶ 15 (quoting-in-part ECF No. 1-5 at 1-2); *accord* 48 C.F.R. § 32.502-4

(instructing when FAR part 52.232-16 should be used).

Two of the renovations to the fitness facility that Redstick performed are relevant to our

motion: replacing the gym floor and installing a heating, ventilation, and air conditioning

(HVAC) system.  Compl. ¶¶ 16, 21.  As to the gym floor, Redstick was required to remove the

existing floor, level the concrete subfloor, and install a new rubberized floor.  ECF No. 1-4 at 7-8.  Redstick removed the existing floor, leveled only portions of the subfloor, and installed the rubberized flooring over the uneven concrete, resulting in a gym floor that the Government deemed non-conforming because it had "dips and peaks in several areas."  ECF No. 5 at 2-3.  As to the HVAC system, Capitol contends that the contracting officer's representative directed Redstick to perform work that was outside the scope specified in the original contract.  Compl. ¶ 21.  Redstick's subcontractor completed that work on December 4, 2015, and on August 15, 2016, billed Capitol for $94,847.10.  ECF No. 1-4 at 12-14, 123, 139, 164, 181, 241.

On March 28, 2016, the Government terminated the contract with Redstick for default.  Compl. ¶ 8.  The Government made nine progress payments to Redstick totaling $2,077,108.68 for work performed through December 19, 2015, which corresponded to 90% of the contract price and which left a contract balance of $230,792.85.  ECF No. 1-4 at 2-5.

II.     The Takeover Agreement And The Completion Contract

On October 2, 2014, Capitol issued performance and payment bonds to Redstick.  Compl. ¶¶ 4-5.  Accordingly, after Redstick defaulted, the Army called upon Capitol to complete the work required by the original contract, including to fix the non-conforming work performed by Redstick.  Id. ¶ 8.  Capitol subsequently executed two contracts with the Government.

On May 12, 2016, the parties executed a takeover agreement.  Compl. ¶¶ 8-10; ECF No. 1-2.  Pursuant to that agreement, Capitol was required to hire another contractor to complete the work on the project.  ECF No. 1-2 at 2 ¶ 2; ECF No. 1-5 at 6 (reproducing punch list of non-conforming work that was incorporated into the takeover agreement).  Upon successful completion of the work, the Government would release to Capitol the $239,792.85 contract balance.  ECF No. 1-2 at 2-3 ¶¶ 3-4.  The takeover agreement also purports to recognize Capitol's "subrogation rights" to "any and all claims of overpayment and/or payments made in

3

violation of the terms of the [original contract]."  Compl. ¶ 10 (quoting ECF No. 1-2 at 5 ¶ 13a).

"[T]o the extent permitted by law," the takeover agreement also purports to memorialize the

Government's consent and acknowledgement of an assignment to Capitol of Redstick's claims

under the original contract.  *Id.* ¶ 12 (quoting ECF No. 1-2 at 5 ¶ 13b).

The complaint refers to a general indemnity agreement that Redstick and Capitol

executed in September 2013.  Compl. ¶ 12; ECF No. 1-3.  Pursuant to that agreement, Redstick

would assign to Capitol any rights in and claims under a contract on which Redstick defaulted

and for which Capitol had issued bonds.  *See generally* ECF No. 1-3.  Notably, the takeover

agreement does not mention that indemnity agreement, *see* ECF No. 1-2, nor does the complaint

allege that the Government had any knowledge that Redstick had assigned any rights to or claims

arising under the original contract.

On June 1, 2016, the Government and Capitol executed contract no. W91151-16-C-0042

(the "completion contract"), which specified a period of performance that ended on October 31,

2016.  Appx1, Appx50.  The work required by the completion contract consisted "of items

identified as incomplete and/or non-compliant" as shown in the punch list incorporated into the

takeover agreement.  Appx3.  Capitol's subcontractor appears to have completed the installation

of a conforming gym floor on or around August 20, 2016, at a cost of $135,065.69.  ECF No. 1-4

at 7-11, 103-106.  Capitol timely performed the work required by the completion contract, and

accordingly, the Government released the contract balance.

III.    Capitol's Certified Claim

On March 22, 2017, Capitol submitted to the contracting officer a certified claim for

$693,569.02.  Compl. ¶ 18; ECF No. 1-4.  On July 24, 2017, the contracting officer denied

Capitol's claim in its entirety.  Compl. ¶ 8; ECF No. 1-5.

First, Capitol claimed that it was entitled to $463,657.13 in damages corresponding to

"overpayment by the Government to Redstick."  ECF No. 1-4 at 1-7.  Capitol contended that the

Government should have suspended payments to Redstick in accordance with FAR part 52.232-

16 because Redstick was not paying its subcontractors.  *Id.* at 7.  The claimed amount was the

difference between what Redstick owed its subcontractors at the time of default ($694,449.98)

and the contract balance ($230,792.85).  *Id.* at 2.  The contracting officer denied this part of

Capitol's claim for two main reasons: (1) FAR part 52.232-16, which was inadvertently

incorporated into the contract, applied to contracts where progress payments would be made

based on costs, and (2) FAR part 28.106-7(a) provides that "agencies shall not withhold

payments due contractors or assignees because subcontractors or suppliers have not been paid."[1]

ECF No. 1-5 at 1-2.

Second, Capitol claimed entitlement to a $135,065.69 adjustment to the price of the

original contract to compensate it for the costs associated with fixing the non-conforming gym

floor Redstick had installed.[2]  ECF No. 1-4 at 7-11.  Capitol contended that the Government

should have issued a stop-work order after recognizing that Redstick's concrete-leveling work

was non-conforming (*i.e.*, before the rubberized floor was installed).  *Id.* at 10.  The contracting

officer denied this part of Capitol's claim because Redstick's work on the gym floor "was always

considered non-conforming work that the surety had a responsibility to correct," as evidenced by

the agreements executed by the Government and Capitol.  ECF No. 1-5 at 2-3.  As to Capitol's

contention that the Government should have issued a stop-work order, the contracting officer

---

[1] The complaint does not allege that any of Redstick's subcontractors, other than the HVAC subcontractor, have sought payment from Capitol.

[2] In the takeover agreement, the parties agreed that the "Original Contract amount shall be increased by the value of proposed Change Orders submitted by the surety and subsequently approved by the [Government]."  ECF No. 1-2 at 2 ¶ 3c.  The contract balance would increase by the amount of any equitable adjustment the contracting officer made to the price of the original contract, which is why we refer to the original contract rather than the completion contract.

explained that the Government informed Redstick that its concrete-leveling work was deficient but that Redstick nevertheless "proceeded to install the rubber matting over a weekend and without authorization to work, and without the Government's knowledge." *Id.* at 2 ¶ 2a.

Third, Capitol claimed it was entitled to an adjustment of the price of the original contract to account for the $94,847.10 it was billed in August 2016 by Redstick's HVAC subcontractor for its work described above on page 3.  ECF No. 1-4 at 12-14.  This portion of Capitol's claim was denied for several reasons: Redstick apparently did not understand the scope of the work, nothing in the documentation submitted by Redstick evidenced any changes to the scope of the work required on the HVAC system, there was no credible evidence that the contracting officer's representative had actually directed any changes to the work, and in any case, Redstick knew that the contracting officer's representative lacked authority to direct changes to the work that would affect any terms of the original contract.  ECF No. 1-5 at 3-4.

IV.     The Claims Asserted In The Complaint

On June 26, 2018, Capitol filed its complaint asserting two counts that contain the three parts of its certified claim.

Count I, entitled "Equitable Subrogation and Adjustment," asserts the first two parts of Capitol's certified claim.  Compl. ¶¶ 14-19.  First, Capitol asserts under a theory of equitable subrogation that it is entitled to $463,657.13, the amount Redstick owed its subcontractors when the original contract was terminated.  Compl. ¶¶ 15, 17; ECF No. 1-4 at 1-7.  Second, Capitol requests that the price of its original contract be adjusted by $135,065.69 to correspond to the costs incurred in fixing the non-conforming gym floor that Redstick installed.  Compl. ¶¶ 16-17; ECF No. 1-4 at 7-11.  Capitol asserts the second aspect of count I under the changes clause, FAR Part 52.243-4, on the theory that the scope of work of the original contract was constructively changed by the contracting officer, although Capitol does not identify the statement that it (or

6

Redstick) believes should be construed as a change order.  Compl. ¶ 19 (alleging that on April 16, 2017, Capitol provided the "written notice . . . of the source of the change order" as required by FAR Part 52.243-4); *see* 48 C.F.R. § 52.243-4(b) (providing that a written notice from a contractor is required only if the contractor interprets a statement as a change order).  Capitol contends that this request for an equitable adjustment, as well as the one alleged in count II, was assigned to it by Redstick.  Compl. ¶¶ 12, 24.

Count II, entitled "Breach of Contract," corresponds to the third part of Capitol's certified claim—an equitable adjustment to the price of the original contract to compensate Capitol for the $94,847.10 in costs associated with the work on the HVAC system for which Redstick's subcontractor billed Capitol in August 2016.  Compl. ¶¶ 20-23; *see* p. 3 above.  This claim, too, is brought under the theory that a constructive change to the scope of work occurred, although, again, Capitol fails to identify the statement either it or Redstick construed as a change order.  Compl. ¶¶ 21, 23; *see* 48 C.F.R. § 52.243-4(b).

ARGUMENT

The complaint brought by Capitol suffers from three procedural defects that require the Court to dismiss this matter.  First, Capitol, in its capacity as a surety, brings a claim for entitlement to damages corresponding to pre-default payments to Redstick, which is a type of claim the Federal Circuit has explained this Court lacks jurisdiction to entertain.  Second, Capitol's two claims for equitable adjustments are also jurisdictionally defective because they arose before Capitol was in privity of contract with the Government.  Third, Capitol's two claims for equitable adjustments are defective for the additional reason that even under the most generous reading of the pleadings, Capitol has not alleged all of the elements of FAR part 52.243-4, the provision under which it brings those claims.

I.      Standard Of Review

The existence of jurisdiction is a threshold issue that the Court must decide.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998).  A plaintiff attempting to invoke the Court's jurisdiction under 28 U.S.C. § 1491(a) must identify a "money-mandating source" of that jurisdiction.  *Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin.*, 525 F.3d 1299, 1309 (Fed. Cir. 2008).  In rendering a decision on a motion to dismiss pursuant to RCFC 12(b)(1), "this court must presume all undisputed factual allegations to be true and must construe all reasonable inferences in favor of the plaintiff."  *Doe v. United States*, 106 Fed. Cl. 118, 122 (2012) (citations omitted).  The plaintiff must establish by preponderant evidence that this Court possesses subject-matter jurisdiction over his claims.  *Id.* (citations omitted).

When disposing of a motion to dismiss pursuant to RCFC 12(b)(6), the Court must determine whether, based solely on the pleadings, "a claim has been stated adequately."  *Brocade Commc'n Sys. v. United States*, 120 Fed. Cl. 73, 78 (2015) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007)); *Huntington Promotional & Supply, LLC v. United States*, 114 Fed. Cl. 760, 767 (2014) (citing *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157, 1164 (Fed. Cir. 1993)).  A claim should survive a Rule 12(b)(6) motion only if the plaintiff's "factual allegations [are] substantial enough to raise the right to relief 'above the speculative level.'"  *Brocade*, 120 Fed. Cl. at 78 (quoting *Bell Atl. Corp.*, 550 U.S. at 555).  In determining whether a plaintiff has adequately stated a claim, the Court must accept as true all factual allegations in the complaint and must make all reasonable inferences in favor of the plaintiff.  *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555-56).

II.     The Court Lacks Jurisdiction To Entertain Capitol's Claim To Pre-Default Payments The Government Made To Redstick

In count I, Capitol claims entitlement to damages corresponding to the $463,657.13

Redstick owed its subcontractors at the time the original contract was terminated for default. Compl. ¶¶ 15, 17.  Capitol brings this aspect of count I under a theory of equitable subrogation, rather than the Contract Disputes Act (CDA).  As we demonstrate below, the Court lacks jurisdiction to entertain this portion of count I because as a matter of law, an equitable subrogee has no rights in any pre-default payments the Government made to a contractor.

"The theory of equitable subrogation is based on the view that the triggering of a surety's bond obligation gives rise to an implied assignment of rights by operation of law whereby the surety 'is subrogated to the [principal obligor's] property rights in the contract balance.'" *Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1312 (Fed. Cir. 2011) (quoting *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1161 (Fed. Cir. 1985) (alteration made in *Lumbermens*)).  Accordingly, equitable subrogation can be used to recover damages corresponding to payments the Government made to a contractor after the Government received "notice that the bond obligation has been triggered and an implied assignment of the contract rights to the surety has occurred."  *Id.*  The Federal Circuit in *Lumbermens* explained:

> The alleged overpayments in this case were all made *before* the obligee [the Government] received notice of Landmark's [the contractor's] default.  Thus, stepping into the shoes of Landmark at the time of the default notice would not enable Lumbermens [the surety or equitable subrogee] to assert a claim for damages based on the government's alleged overpayments to Landmark. This is so because Landmark itself would have no claim against the government for funds the government had already paid it under the contract (as opposed to a right to recover future payments).

654 F.3d at 1312-13 (alterations added).

Based on these principles, the Federal Circuit has held that this Court possesses jurisdiction over a claim by a surety to payments the Government made to a contractor only if the Government owed a duty to the surety at the time the payments being challenged were made, and such a duty arises only after the Government receives notice that the contractor defaulted.

9

*Insurance Co. of the West v. United States*, 243 F.3d 1367, 1371 (Fed. Cir. 2001).  Thus, the

Court may entertain a claim by an equitable subrogee that the Government improperly made

payments to the contractor after receiving notice that the contractor had defaulted.  *Lumbermens*,

654 F.3d at 1312-13.  In contrast, this Court does not possess jurisdiction to entertain a claim by

an equitable subrogee to pre-default payments the Government made to a contractor.  *Id.*  This is

so even if the plaintiff alleges that those payments were not commensurate with the progress on

the work required by the contract, *id.* at 1312-15, or that they were made despite the agency's

knowledge that the contractor was not paying its subcontractors.  *Fireman's Fund Ins. Co. v.*

*United States*, 909 F.2d 495, 498-99 (Fed. Cir. 1990).

These binding precedents establish that this Court lacks jurisdiction to entertain this

aspect of count I.  Capitol seeks damages corresponding to pre-default payments the Government

made to Redstick that allegedly violated the terms of the original contract.  *See* pp. 4-5, above.

*Lumbermens* and *Fireman's Fund*, however, establish that the Court may not entertain such a

claim.  And because "[p]arties cannot, by agreement, confer upon a tribunal jurisdiction it

otherwise would not have," the provision in the takeover agreement that purports to reserve

Capitol's subrogation rights to pre-default monies paid to Redstick does not save Capitol's

equitable subrogation claim from dismissal under RCFC 12(b)(1).  *United Pac. Ins. Co. v.*

*Roche*, 380 F.3d 1352, 1356-57 (Fed. Cir. 2004) (citations omitted).  For these reasons, the Court

should dismiss the equitable-subrogation portion of count I.  We explain below in section III(A)

that the remainder of count I, as well as count II, should also be dismissed for lack of

jurisdiction.

III.    The Court Should Dismiss Capitol's Claims For Equitable Adjustments

In both counts I and II of the complaint, Capitol seeks equitable adjustments to the price

of the original contract pursuant to the changes clause, FAR part 52.243-4, based on the theories

that the Government constructively changed the requirements of the original contract with respect to the gym floor (count I—$135,069.35) and the HVAC system (count II—$94,847.10) and that those claims have been assigned to it by Redstick.  *See* pp. 6-7, above.  If the Court possesses jurisdiction to entertain these requests for equitable adjustment, it nevertheless should dismiss them for failure to state a claim upon which relief can be granted.

A.     The Court Lacks Jurisdiction To Entertain These Claims Because They Arose Before Capitol Was In Privity Of Contract With The Government

The CDA covers claims "by a contractor against the Federal Government relating to a contract."  41 U.S.C. § 7103(a)(1).  Accordingly, the Court possesses jurisdiction over a claim brought under the CDA only if the plaintiff was in privity of contract with the Government when the claim arose.  *United Pac.*, 380 F.3d at 1355-56.  A claim under the CDA arises when "the operative facts upon which the claim is based . . . occurred."  *Id.*

By relying on a theory that Redstick's rights to assert claims for equitable adjustments were assigned to it, Capitol appears to recognize that these claims arose when Redstick was in privity of contract with the Government.  *See* Compl. ¶¶ 12, 24.  Indeed, if these claims arose when Capitol was in privity of contract with the Government, Capitol would not need to rely upon an assignment of claims.  In any case, the pleadings establish that the operative facts of each request for an equitable adjustment occurred during Redstick's performance under the original contract.  As to the gym floor, Capitol contends that the Government failed to issue a stop-work order to Redstick after it realized that Redstick's work on leveling the concrete subfloor was non-conforming.  *See* pp. 5-6, above.  And all of the work on the HVAC system was completed before the original contract was terminated for default.  *See* p. 3, above.

Therefore, whether the Court possesses jurisdiction to hear Capitol's requests for equitable adjustments turns on whether Redstick's assignment to Capitol of its potential claims

in the original contract was valid. *See Insurance Co. of the West v. United States (ICW)*, 100 Fed. Cl. 58, 65-66 (2011). As it turns out, that assignment violated the Anti-Assignment Act.

"What is commonly referred to as the Anti-Assignment Act consists of two statutory provisions," the latter being applicable here: 41 U.S.C. § 15(a), which prohibits the transfer of a Government contract or any interest therein, and 31 U.S.C. §§ 3727(a)(1) and (b), which concern the assignment of claims against the Government. *Fireman's Fund Ins. Co. v. England*, 313 F.3d 1344, 1349-50 (Fed. Cir. 2002) (discussing the Anti-Assignment Act). Specifically, subsections 3727(a)(1) and (b) provide that an "assignment of any part of a claim against the United States Government or of an interest in a claim . . . may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued." No claims under the original contract have been allowed, and thus, the assignment by Redstick is null and void.

We anticipate that Capitol will respond with an argument that the takeover agreement reveals that the Government consented to Redstick's assignments of its potential claims. *See ICW*, 100 Fed. Cl. at 65-73 (discussing the Government's ability to consent to assignments that violate the Anti-Assignment Act). The Government's knowledge of Redstick's assignment is among the facts Capitol must marshal to establish consent by the Government of an assignment of a claim against it. *E.g.*, *Tuftco v. United States*, 614 F.2d 740, 743-44 (Ct. Cl. 1980). But Capitol does not allege in its complaint that the Government had actual knowledge of an assignment of claims by Redstick; rather, at most, the allegations in the complaint reveal that the takeover agreement alerted the Government that an assignment of Redstick's claims to Capitol might occur. That allegation is not sufficient to establish the Government's consent to Redstick's assignment of its claims. *United Pac.*, 380 F.3d at 1357 (explaining that takeover

12

agreement did not establish Government consent to assignment of claims from contractor to surety through an earlier general indemnity agreement to which the Government was not a party).

B.      These Claims Should Be Dismissed Pursuant To Rule 12(b)(6) Because Even The Most Generous Reading Of The Pleadings Fails To Establish The Elements Of FAR Part 52.243-4

Because Capitol is seeking equitable adjustments to the price of the original contract due to perceived constructive changes to the scope of work, to state a claim for relief, the factual allegations in the complaint must satisfy the elements of FAR parts 52.243-4(b) and (d).  We demonstrate below that they do not.

FAR part 52.243-4(b) provides that a written or oral statement by the contracting officer other than a written change order "shall be treated as a change order . . . ***provided*, that the Contractor gives the Contracting Officer written notice stating (1) the date, circumstances, and source of the order and (2) that the contractor regards the order as a change order."  48 C.F.R. § 52.243-4(b).  If a constructive change order increases the cost of the contractor's performance, the contracting officer may make a corresponding equitable adjustment to the contract price.  *Id.* § 52.243-4(d).  However, "no adjustment for any change under paragraph [52.243-4(b)] shall be made for any costs incurred more than 20 days before the Contractor gives written notice as required," *id.* § 52.243-4(d), unless "extenuating circumstances" caused a delay in submitting that notice.  *K-Con Bldg. Sys., Inc. v. United States*, 778 F.3d 1000, 1010-11 (Fed. Cir. 2015).

Capitol's attempts to state claims for equitable adjustments suffer from three deficiencies.  First, Capitol does not identify the statements by the contracting officer that purportedly changed the scope of work of the original contract.  Second, the complaint alleges that Capitol provided the notice required by FAR part 52.243-4(b) on April 16, 2017, which was several months after the completion of both the work to fix the gym floor (August 2016) and the work on the HVAC

unit performed by Redstick's subcontractor (December 2015).  ECF No. 1-4 at 103-106, 241.

Thus, Capitol failed to submit its notice within 20 days of incurring the costs it seeks to recover

through equitable adjustments.  Finally, the complaint contains no factual allegations that could

support an inference that "extenuating circumstances" prohibited the timely submission of the

notices because the complaint does not address the delay at all.[3]  *K-Con*, 778 F.3d at 1010-11.

      In sum, even were the Court to conclude that it possesses jurisdiction to entertain this

matter, based on the face of the complaint, Capitol has failed to state claims for equitable

adjustments upon which relief can be granted.  Therefore, these aspects of Capitol's complaint

should be dismissed pursuant to RCFC 12(b)(6).

<u>CONCLUSION</u>

      For these reasons, the United States respectfully requests that the Court dismiss the

complaint in its entirety.

---

[3] The timing of Capitol's submission of its certified claim does not change this analysis, because that claim was submitted only a month before Capitol alleges it submitted its notice of constructive change.  Compl. ¶ 18.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

s/Deborah A. Bynum
DEBORAH A. BYNUM
Assistant Director

OF COUNSEL:

Major Adrian Allison
General Litigation Branch
United States Army Legal Services Agency
United States Army

s/Daniel K. Greene
DANIEL K. GREENE
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
PO Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-0342
Fax: (202) 514-8624
Daniel.K.Greene@usdoj.gov

Dated: October 26, 2018

*Attorneys for Defendant*

# <u>APPENDIX</u>

<u>Table of Contents</u>

Excerpts from Contract No. W91151-16-C-0042 (June 1, 2016)...........................................Appx1

Modification of Contract No. W91151-16-C-0042 (Sept. 30, 2016) ...................................Appx50

| **SOLICITATION, OFFER, AND AWARD** *(Construction, Alteration, or Repair)* | 1. SOLICITATION NO. | 2. TYPE OF SOLICITATION  ☐ SEALED BID   (IFB)  ☐ NEGOTIATED   *(RFP)* | 3. DATE ISSUED  01-Jun-2016 | PAGE OF PAGES  1 OF   40 |
|---|---|---|---|---|

**IMPORTANT - The "offer" section on the reverse must be fully completed by offeror.**

| 4. CONTRACT NO.  W91151-16-C-0042 | 5. REQUISITION/PURCHASE REQUEST NO.  0010870421 | 6. PROJECT NO.  AD004720P |
|---|---|---|

| 7. ISSUED BY              CODE   W91151 | 8. ADDRESS OFFER TO   *(If Other Than Item 7)*  CODE |
|---|---|
| MISSION AND INSTALLATION CONTRACTING  MISSION CONTRACTING OFFICE (MCO)  BUILDING 1001,   ROOM W103  1001 761ST TANK BATTALION AVE  FORT HOOD TX 76544-5025  TEL: 254-287-5475          FAX: | **See Item 7**  TEL:                              FAX: |

| 9. FOR INFORMATION CALL: | A. NAME | B. TELEPHONE NO.   *(Include area code)*   *(NO COLLECT CALLS)* |
|---|---|---|

**SOLICITATION**

**NOTE: In sealed bid solicitations "offer" and "offeror" mean "bid" and "bidder".**

10. THE GOVERNMENT REQUIRES PERFORMANCE OF THE WORK DESCRIBED IN THESE DOCUMENTS          *(Title, identifying no., date):*

Repair Iron Horse Gym Building 37017

11. The Contractor shall begin performance within ___1___ calendar days and complete it within ___76___ calendar days after receiving

☒ award,   ☐ notice to proceed. This performance period is ☒ mandatory,   ☐ negotiable.   *(See* FAR 52.211-10_____ *.)*

12 A. THE CONTRACTOR MUST FURNISH ANY REQUIRED PERFORMANCE AND PAYMENT BONDS?  *(If "YES," indicate within how many calendar days after award in Item 12B.)*  ☐ YES   ☒ NO | 12B. CALENDAR DAYS

13. ADDITIONAL SOLICITATION REQUIREMENTS:

A. Sealed offers in original and _____ copies to perform the work required are due at the place specified in Item 8 by _____   *(hour)* local time _____ *(date).*   If this is a sealed bid solicitation, offers must be publicly opened at that time.   Sealed envelopes containing offers shall be marked to show the offeror's name and address, the solicitation number, and the date and time offers are due.

B. An offer guarantee ☐ is, ☐ is not required.

C. All offers are subject to the (1) work requirements, and (2) other provisions and clauses incorporated in the solicitation in full text or by reference.

D. Offers providing less than _____ calendar days for Government acceptance after the date offers are due will not be considered and will be rejected.

| NSN 7540-01-155-3212 | 1442-101 | **STANDARD FORM 1442**   (REV. 4-85)  Prescribed by GSA  FAR (48 CFR) 53.236-1(e) |
|---|---|---|

APPX1

1

**SOLICITATION, OFFER, AND AWARD** (Continued)

*(Construction, Alteration, or Repair)*

**OFFER** *(Must be fully completed by offeror)*

| 14. NAME AND ADDRESS OF OFFEROR *(Include ZIP Code)*<br>CAPITOL INDEMNITY CORPORATION<br>PATRICIA FRAMKE<br>1600 ASPEN COMMONS<br>MIDDLETON WI 53562-4718 | 15. TELEPHONE NO. *(Include area code)*<br>608.829.4256 |
|---|---|
| | 16. REMITTANCE ADDRESS *(Include only if different than Item 14)*<br><br>**See Item 14** |

| CODE<br>1D3W0 | FACILITY CODE<br>1D3W0 | |

17. The offeror agrees to perform the work required at the prices specified below in strict accordance with the terms of this solicitation, if this offer is accepted by the Government in writing within _____ calendar days after the date offers are due.   *(Insert any number equal to or greater than the minimum requirements stated in Item 13D.   Failure to insert any number means the offeror accepts the minimum in Item 13D.)*

| AMOUNTS | SEE SCHEDULE OF PRICES |
|---|---|

18. The offeror agrees to furnish any required performance and payment bonds.

**19. ACKNOWLEDGMENT OF AMENDMENTS**

*(The offeror acknowledges receipt of amendments to the solicitation -- give number and date of each)*

| AMENDMENT NO. | | | | | | | |
|---|---|---|---|---|---|---|---|
| DATE | | | | | | | |

| 20A. NAME AND TITLE OF PERSON AUTHORIZED TO SIGN OFFER   *(Type or print)* | 20B. SIGNATURE | 20C. OFFER DATE |
|---|---|---|

**AWARD** *(To be completed by Government)*

21. ITEMS ACCEPTED:

# SEE SCHEDULE

| 22. AMOUNT<br>**$230,792.85** | 23. ACCOUNTING AND APPROPRIATION DATA<br>**See Schedule** | |
|---|---|---|

| 24. SUBMIT INVOICES TO ADDRESS SHOWN IN<br>*(4 copies unless otherwise specified)* | **ITEM** | 25. OTHER THAN FULL AND OPEN COMPETITION PURSUANT TO<br>☐ 10 U.S.C. 2304(c)   ☐ 41 U.S.C. 253(c) |
|---|---|---|

| 26. ADMINISTERED BY   CODE   W91151<br>DIRECTORATE OF PUBLIC WORKS<br>ENGINEERING DIVISION (CONTRACTING SECTION)<br>BLDG 4610, ENGINEER DRIVE<br>FORT HOOD TX 76544-5055 | 27. PAYMENT WILL BE MADE BY:   CODE   HQ0490<br>DFAS-INDY VP GFEBS<br>8899 E 56TH STREET<br>INDIANAPOLIS IN 46249-3800 |
|---|---|

*CONTRACTING OFFICER WILL COMPLETE ITEM 28 OR 29 AS APPLICABLE*

| ☐ 28. NEGOTIATED AGREEMENT   *(Contractor is required to sign this document and return _____ copies to issuing office.)*   Contractor agrees to furnish and deliver all items or perform all work, requisitions identified on this form and any continuation sheets for the consideration stated in this contract.  The rights and obligations of the parties to this contract shall be governed by (a) this contract award, (b) the solicitation, and (c) the clauses, representations, certifications, and specifications or incorporated by reference in or attached to this contract. | ☐ 29. AWARD   *(Contractor is not required to sign this document.)*<br>Your offer on this solicitation, is hereby accepted as to the items listed. This award consummates the contract, which consists of (a) the Government solicitation and your offer, and (b) this contract award. No further contractual document is necessary. |
|---|---|
| 30A. NAME AND TITLE OF CONTRACTOR OR PERSON AUTHORIZED TO SIGN   *(Type or print)* | 31A. NAME OF CONTRACTING OFFICER   *(Type or print)*<br>JENNIFER L. PARKER / CONTRACTING OFFICER<br><br>TEL: 254-287-3054        EMAIL: jennifer.l.parker@us.army.mil |
| 30B. SIGNATURE          30C. DATE | 31B. UNITED STATES OF AMERICA<br>BY *Jennifer L. Parker*          31C. AWARD DATE<br>01-Jun-2016 |

APPX2

W91151-16-C-0042

Page 3 of 40

Section 00010 - Solicitation Contract Form

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---------|-------------------|----------|------|------------|--------|
| 0001 | | 1 | Job | $230,792.85 | $230,792.85 |

Repair Iron Horse Physical Fitness Ctr
FFP
Repair Iron Horse Physical Fitness Center, Building 37017, in accordance with the
project synopsis, plans, drawings, specifications.
FOB: Destination
PURCHASE REQUEST NUMBER: 0010870421

| | | |
|---|---|---|
| | NET AMT | $230,792.85 |
| ACRN AA | | $230,792.85 |
| CIN: GFEBS001087042100010 | | |

CONTINUATION SHEET

CONTINUATION SHEET FOR
CONTRACT W91151-16-C-0042
Project AD004720p, Repairs to Iron Horse Gymnasium, Building 37017
Fort Hood, Texas

This contract is issued pursuant to the negotiated takeover agreement between the Government and Capitol Indemnity Corporation (Surety), and as a result of the termination for default of the Original Contractor (Redstick, Inc., of St. Augustine, Florida) under Contract W91151-14-C-0061. This contract hereby incorporates all plans, drawings and specifications governing the repairs to Building 37017, Iron Horse Gymnasium.

The issuance of this contract constitutes the Contracting Officer's official notice to proceed for work relating to the completion of repairs to Iron Horse Gymnasium, for a period of performance beginning on 1 June 2016, and ending on 15 August 2016.

This contract is issued inclusive of all terms, conditions, provisions, and clauses of the Original Contract, with the following exceptions:

1.  The work under this contract consists only of items identified as incomplete and/or non-compliant as shown on Technical Exhibit A to this contract, and as agreed to by the parties as necessary to complete the contractual obligations of the Original Contractor, and to make the facility complete and usable for its intended purpose.

2.  The Progress Schedule to be submitted for this contract is limited to a mutually agreeable Gantt chart showing the critical path of work remaining under the original contract and described at Technical Exhibit A.

3.  Materials submitted and approved under the Original Contract transfer to this contract without re-submission, except for the cementus materials intended to level the gym floor, and the rubber matting material used to finish the gym floor. All other materials needed to complete the work and approved under the Original Contract are considered approved for use under this contract as long as there is no deviation from that approval.

4.  Preparatories are limited to the application of the leveling compound material and the matting material used for the flooring in the gym, and described at Technical Exhibit A.

3

5.  Requests to work after-hours and/or on weekends and Holidays may be made verbally directly to the appointed Contracting Officer's Representative, with verification of the request and approval being provided to the Contracting Officer within 24 hours of approval.
6.  The sub-contractor, 3B-S General Contracting, is authorized to provide a full-time superintendent and quality control manager, on behalf of the Surety, as the Completion Contractor.

INSPECTION AND ACCEPTANCE TERMS

Supplies/services will be inspected/accepted at:

| CLIN | INSPECT AT | INSPECT BY | ACCEPT AT | ACCEPT BY |
|------|-----------|-----------|----------|-----------|
| 0001 | N/A | N/A | N/A | Government |

DELIVERY INFORMATION

| CLIN | DELIVERY DATE | QUANTITY | SHIP TO ADDRESS | DODAAC |
|------|--------------|----------|----------------|--------|
| 0001 | POP 01-JUN-2016 TO 15-AUG-2016 | N/A | DIRECTORATE OF PUBLIC WORKS DPW CONSTRUCTION COR 4612 ENGINEER DRIVE FORT HOOD TX 76544 FOB:  Destination | W45NQ9 |

Exhibit/Attachment Table of Contents

| DOCUMENT TYPE | DESCRIPTION | PAGES | DATE |
|---------------|------------|-------|------|
| Exhibit A | Tech Exhibit A - Specifications | 809 | 05-FEB-2014 |
| Exhibit B | Tech Exhibit B - Drawings | 35 | 31-JAN-2014 |
| Exhibit C | Tech Exhibit C - Roof Warranty | 1 | 07-APR-2011 |
| Exhibit D | Tech Exhibit D - 1967 As-builts | 9 | 04-APR-1967 |
| Exhibit E | Tech Exhibit E - 1977 As-builts | 1 | 01-MAY-1977 |
| Exhibit F | Tech Exhibit F - 1985 As-builts | 7 | 01-JUL-1985 |
| Exhibit G | Tech Exhibit G - 1996 As-builts | 8 | 10-SEP-1996 |
| Exhibit H | Tech Exhibit H - 2003 | 1 | 23-OCT-2003 |

| | | | |
|---|---|---|---|
| | As-builts | | |
| Exhibit I | Tech Exhibit I - 2004 As-builts | 1 | 24-MAR-2004 |
| Exhibit J | Tech Exhibit J - Take Over Agreement | 8 | 13-MAY-2016 |
| Exhibit K | Tech Exhibit K - Exhibit A to Takeover Agreement | 2 | 13-MAY-2016 |
| Attachment 1 | Attachment 1 Appendix A113 Specifications | | 03-FEB-2014 |

Section 00700 - Contract Clauses

## CLAUSES INCORPORATED BY REFERENCE

| | | |
|---|---|---|
| 52.202-1 | Definitions | NOV 2013 |
| 52.203-3 | Gratuities | APR 1984 |
| 52.203-5 | Covenant Against Contingent Fees | MAY 2014 |
| 52.203-7 | Anti-Kickback Procedures | MAY 2014 |
| 52.203-8 | Cancellation, Rescission, and Recovery of Funds for Illegal or Improper Activity | MAY 2014 |
| 52.203-10 | Price Or Fee Adjustment For Illegal Or Improper Activity | MAY 2014 |
| 52.203-12 | Limitation On Payments To Influence Certain Federal Transactions | OCT 2010 |
| 52.203-13 | Contractor Code of Business Ethics and Conduct | OCT 2015 |
| 52.204-4 | Printed or Copied Double-Sided on Postconsumer Fiber Content Paper | MAY 2011 |
| 52.204-10 | Reporting Executive Compensation and First-Tier Subcontract Awards | OCT 2015 |
| 52.209-6 | Protecting the Government's Interest When Subcontracting With Contractors Debarred, Suspended, or Proposed for Debarment | OCT 2015 |
| 52.211-13 | Time Extensions | SEP 2000 |
| 52.214-26 | Audit and Records--Sealed Bidding | OCT 2010 |
| 52.214-27 | Price Reduction for Defective Certified Cost or Pricing Data - Modifications - Sealed Bidding | AUG 2011 |
| 52.214-28 | Subcontracting Certified Cost Or Pricing Data-- Modifications--Sealed Bidding | OCT 2010 |
| 52.222-3 | Convict Labor | JUN 2003 |
| 52.222-4 | Contract Work Hours and Safety Standards- Overtime Compensation | MAY 2014 |
| 52.222-6 | Construction Wage Rate Requirements | MAY 2014 |
| 52.222-7 | Withholding of Funds | MAY 2014 |
| 52.222-8 | Payrolls and Basic Records | MAY 2014 |
| 52.222-9 | Apprentices and Trainees | JUL 2005 |
| 52.222-10 | Compliance with Copeland Act Requirements | FEB 1988 |
| 52.222-11 | Subcontracts (Labor Standards) | MAY 2014 |
| 52.222-12 | Contract Termination-Debarment | MAY 2014 |
| 52.222-13 | Compliance With Construction Wage Rate Requirements and Related Regulations | MAY 2014 |
| 52.222-14 | Disputes Concerning Labor Standards | FEB 1988 |
| 52.222-15 | Certification of Eligibility | MAY 2014 |
| 52.222-21 | Prohibition Of Segregated Facilities | APR 2015 |
| 52.222-26 | Equal Opportunity | APR 2015 |
| 52.222-27 | Affirmative Action Compliance Requirements for Construction | APR 2015 |
| 52.222-35 | Equal Opportunity for Veterans | OCT 2015 |
| 52.222-36 | Equal Opportunity for Workers with Disabilities | JUL 2014 |
| 52.222-37 | Employment Reports on Veterans | FEB 2016 |
| 52.222-40 | Notification of Employee Rights Under the National Labor Relations Act | DEC 2010 |
| 52.222-50 | Combating Trafficking in Persons | MAR 2015 |
| 52.223-5 | Pollution Prevention and Right-to-Know Information | MAY 2011 |
| 52.223-12 | Refrigeration Equipment and Air Conditioners | MAY 1995 |

| | | |
|---|---|---|
| 52.223-15 | Energy Efficiency in Energy-Consuming Products | DEC 2007 |
| 52.223-18 | Encouraging Contractor Policies To Ban Text Messaging While Driving | AUG 2011 |
| 52.225-13 | Restrictions on Certain Foreign Purchases | JUN 2008 |
| 52.228-2 | Additional Bond Security | OCT 1997 |
| 52.228-5 | Insurance - Work On A Government Installation | JAN 1997 |
| 52.228-15 | Performance and Payment Bonds--Construction | OCT 2010 |
| 52.229-4 | Federal, State, And Local Taxes (State and Local Adjustments) | FEB 2013 |
| 52.232-5 | Payments under Fixed-Price Construction Contracts | MAY 2014 |
| 52.232-23 | Assignment Of Claims | MAY 2014 |
| 52.232-27 | Prompt Payment for Construction Contracts | MAY 2014 |
| 52.232-33 | Payment by Electronic Funds Transfer--System for Award Management | JUL 2013 |
| 52.232-37 | Multiple Payment Arrangements | MAY 1999 |
| 52.233-1 | Disputes | MAY 2014 |
| 52.233-3 | Protest After Award | AUG 1996 |
| 52.233-4 | Applicable Law for Breach of Contract Claim | OCT 2004 |
| 52.236-2 | Differing Site Conditions | APR 1984 |
| 52.236-3 | Site Investigation and Conditions Affecting the Work | APR 1984 |
| 52.236-5 | Material and Workmanship | APR 1984 |
| 52.236-6 | Superintendence by the Contractor | APR 1984 |
| 52.236-7 | Permits and Responsibilities | NOV 1991 |
| 52.236-8 | Other Contracts | APR 1984 |
| 52.236-9 | Protection of Existing Vegetation, Structures, Equipment, Utilities, and Improvements | APR 1984 |
| 52.236-10 | Operations and Storage Areas | APR 1984 |
| 52.236-11 | Use and Possession Prior to Completion | APR 1984 |
| 52.236-12 | Cleaning Up | APR 1984 |
| 52.236-13 | Accident Prevention | NOV 1991 |
| 52.236-14 | Availability and Use of Utility Services | APR 1984 |
| 52.236-15 | Schedules for Construction Contracts | APR 1984 |
| 52.236-21 | Specifications and Drawings for Construction | FEB 1997 |
| 52.236-26 | Preconstruction Conference | FEB 1995 |
| 52.242-14 | Suspension of Work | APR 1984 |
| 52.243-4 | Changes | JUN 2007 |
| 52.246-12 | Inspection of Construction | AUG 1996 |
| 52.246-21 | Warranty of Construction | MAR 1994 |
| 52.249-3 Alt I | Termination for Convenience of the Government (Dismantling, Demolition, or Removal of Improvements) (Apr 2012) - Alternate I | SEP 1996 |
| 52.249-10 | Default (Fixed-Price Construction) | APR 1984 |
| 252.203-7000 | Requirements Relating to Compensation of Former DoD Officials | SEP 2011 |
| 252.203-7001 | Prohibition On Persons Convicted of Fraud or Other Defense-Contract-Related Felonies | DEC 2008 |
| 252.203-7002 | Requirement to Inform Employees of Whistleblower Rights | SEP 2013 |
| 252.204-7004 Alt A | System for Award Management Alternate A | FEB 2014 |
| 252.222-7006 | Restrictions on the Use of Mandatory Arbitration Agreements | DEC 2010 |
| 252.223-7006 | Prohibition On Storage, Treatment, and Disposal of Toxic or Hazardous Materials | SEP 2014 |
| 252.223-7008 | Prohibition of Hexavalent Chromium | JUN 2013 |
| 252.243-7001 | Pricing Of Contract Modifications | DEC 1991 |
| 252.243-7002 | Requests for Equitable Adjustment | DEC 2012 |

| 252.247-7022 | Representation Of Extent Of Transportation Of Supplies By Sea | AUG 1992 |
|---|---|---|

CLAUSES INCORPORATED BY FULL TEXT

52.211-10    COMMENCEMENT, PROSECUTION, AND COMPLETION OF WORK (APR 1984)

The Contractor shall be required to (a) commence work under this contract within 1 calendar days after the date the Contractor receives contract award, (b) prosecute the work diligently, and (c) complete the entire work ready for use not later than  76 calendar days after award.  *The time stated for completion shall include final cleanup of the premises.

*The Contracting Officer shall specify either a number of days after the date the contractor receives the notice to proceed, or a calendar date.

(End of clause)

52.211-12    LIQUIDATED DAMAGES--CONSTRUCTION (SEP 2000)

(a) If the Contractor fails to complete the work within the time specified in the contract, the Contractor shall pay liquidated damages to the Government in the amount of $1,058.00 for each calendar day of delay until the work is completed or accepted.

(b) If the Government terminates the Contractor's right to proceed, liquidated damages will continue to accrue until the work is completed. These liquidated damages are in addition to excess costs of repurchase under the Termination clause.

(End of clause)

52.219-28    POST-AWARD SMALL BUSINESS PROGRAM REREPRESENTATION (JULY 2013)

(a) Definitions. As used in this clause--

Long-term contract means a contract of more than five years in duration, including options. However, the term does not include contracts that exceed five years in duration because the period of performance has been extended for a cumulative period not to exceed six months under the clause at 52.217-8, Option to Extend Services, or other appropriate authority.

Small business concern means a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as a small business under the criteria in 13 CFR part 121 and the size standard in paragraph (c) of this clause. Such a concern is ``not dominant in its field of operation'' when it does not exercise a controlling or major influence on a national basis in a kind of business activity in which a number of business concerns are primarily engaged. In determining whether dominance exists, consideration shall be given to all appropriate factors, including volume of business, number of employees, financial resources, competitive status or position, ownership or control of materials, processes, patents, license agreements, facilities, sales territory, and nature of business activity.

8

(b) If the Contractor represented that it was a small business concern prior to award of this contract, the Contractor shall rerepresent its size status according to paragraph (e) of this clause or, if applicable, paragraph (g) of this clause, upon the occurrence of any of the following:

(1) Within 30 days after execution of a novation agreement or within 30 days after modification of the contract to include this clause, if the novation agreement was executed prior to inclusion of this clause in the contract.

(2) Within 30 days after a merger or acquisition that does not require a novation or within 30 days after modification of the contract to include this clause, if the merger or acquisition occurred prior to inclusion of this clause in the contract.

(3) For long-term contracts--

(i) Within 60 to 120 days prior to the end of the fifth year of the contract; and

(ii) Within 60 to 120 days prior to the date specified in the contract for exercising any option thereafter.

(c) The Contractor shall rerepresent its size status in accordance with the size standard in effect at the time of this rerepresentation that corresponds to the North American Industry Classification System (NAICS) code assigned to this contract. The small business size standard corresponding to this NAICS code can be found at http://www.sba.gov/content/table-small-business-size-standards.

(d) The small business size standard for a Contractor providing a product which it does not manufacture itself, for a contract other than a construction or service contract, is 500 employees.

(e) Except as provided in paragraph (g) of this clause, the Contractor shall make the representation required by paragraph (b) of this clause by validating or updating all its representations in the Representations and Certifications section of the System for Award Management (SAM) and its other data in SAM, as necessary, to ensure that they reflect the Contractor's current status. The
Contractor shall notify the contracting office in writing within the timeframes specified in paragraph (b) of this clause that the data have been validated or updated, and provide the date of the validation or update.

(f) If the Contractor represented that it was other than a small business concern prior to award of this contract, the Contractor may, but is not required to, take the actions required by paragraphs (e) or (g) of this clause.

(g) If the Contractor does not have representations and certifications in SAM, or does not have a representation in SAM for the NAICS code applicable to this contract, the Contractor is required to complete the following rerepresentation and submit it to the contracting office, along with the contract number and the date on which the rerepresentation was completed:

The Contractor represents that it (  ) is, (  ) is not a small business concern under NAICS Code 236220 assigned to contract number W91151-16-C-0042.

(Contractor to sign and date and insert authorized signer's name and title).

(End of clause)

52.222-54   EMPLOYMENT ELIGIBILITY VERIFICATION (OCT 2015)

(a) Definitions. As used in this clause--Commercially available off-the-shelf (COTS) item—

(1) Means any item of supply that is--

(i) A commercial item (as defined in paragraph (1) of the definition at 2.101);

(ii) Sold in substantial quantities in the commercial marketplace; and

(iii) Offered to the Government, without modification, in the same form in which it is sold in the commercial marketplace; and

(2) Does not include bulk cargo, as defined in 46 U.S.C. 40102(4), such as agricultural products and petroleum products. Per 46 CFR 525.1(c)(2), ``bulk cargo'' means cargo that is loaded and carried in bulk onboard ship without mark or count, in a loose unpackaged form, having homogenous characteristics. Bulk cargo loaded into intermodal equipment, except LASH or Seabee barges, is subject to mark and count and, therefore, ceases to be bulk cargo.

Employee assigned to the contract means an employee who was hired after November 6, 1986 (after November 27, 2009, in the Commonwealth of the Northern Mariana Islands), who is directly performing work, in the United States, under a contract that is required to include the clause prescribed at 22.1803. An employee is not considered to be directly performing work under a contract if the employee--

(1) Normally performs support work, such as indirect or overhead functions; and

(2) Does not perform any substantial duties applicable to the contract.

Subcontract means any contract, as defined in 2.101, entered into by a subcontractor to furnish supplies or services for performance of a prime contract or a subcontract. It includes but is not limited to purchase orders, and changes and modifications to purchase orders.

Subcontractor means any supplier, distributor, vendor, or firm that furnishes supplies or services to or for a prime Contractor or another subcontractor.

United States, as defined in 8 U.S.C. 1101(a)(38), means the 50 States, the District of Columbia, Puerto Rico, Guam, the Commonwealth of the Northern Mariana Islands, and the U.S. Virgin Islands.

(b) Enrollment and verification requirements.

(1) If the Contractor is not enrolled as a Federal Contractor in E-Verify at time of contract award, the Contractor shall--

(i) Enroll. Enroll as a Federal Contractor in the E-Verify program within 30 calendar days of contract award;

(ii) Verify all new employees. Within 90 calendar days of enrollment in the E-Verify program, begin to use E-Verify to initiate verification of employment eligibility of all new hires of the Contractor, who are working in the United States, whether or not assigned to the contract, within 3 business days after the date of hire (but see paragraph (b)(3) of this section); and

(iii) Verify employees assigned to the contract. For each employee assigned to the contract, initiate verification within 90 calendar days after date of enrollment or within 30 calendar days of the employee's assignment to the contract, whichever date is later (but see paragraph (b)(4) of this section).

(2) If the Contractor is enrolled as a Federal Contractor in E-Verify at time of contract award, the Contractor shall use E-Verify to initiate verification of employment eligibility of--

(i) All new employees. (A) Enrolled 90 calendar days or more. The Contractor shall initiate verification of all new hires of the Contractor, who are working in the United States, whether or not assigned to the contract, within 3 business days after the date of hire (but see paragraph (b)(3) of this section); or

(B) Enrolled less than 90 calendar days. Within 90 calendar days after enrollment as a Federal Contractor in E-Verify, the Contractor shall initiate verification of all new hires of the Contractor, who are working in the United States, whether or not assigned to the contract, within 3 business days after the date of hire (but see paragraph (b)(3) of this section); or

(ii) Employees assigned to the contract. For each employee assigned to the contract, the Contractor shall initiate verification within 90 calendar days after date of contract award or within 30 days after assignment to the contract, whichever date is later (but see paragraph (b)(4) of this section).

(3) If the Contractor is an institution of higher education (as defined at 20 U.S.C. 1001(a)); a State or local government or the government of a Federally recognized Indian tribe; or a surety performing under a takeover agreement entered into with a Federal agency pursuant to a performance bond, the Contractor may choose to verify only employees assigned to the contract, whether existing employees or new hires. The Contractor shall follow the applicable verification requirements at (b)(1) or (b)(2), respectively, except that any requirement for verification of new employees applies only to new employees assigned to the contract.

(4) Option to verify employment eligibility of all employees. The Contractor may elect to verify all existing employees hired after November 6, 1986 (after November 27, 2009, in the Commonwealth of the Northern Mariana Islands), rather than just those employees assigned to the contract. The Contractor shall initiate verification for each existing employee working in the United States who was hired after November 6, 1986 (after November 27, 2009, in the Commonwealth of the Northern Mariana Islands), within 180 calendar days of--

(i) Enrollment in the E-Verify program; or

(ii) Notification to E-Verify Operations of the Contractor's decision to exercise this option, using the contact information provided in the E-Verify program Memorandum of Understanding (MOU).

(5) The Contractor shall comply, for the period of performance of this contract, with the requirements of the E-Verify program MOU.

(i) The Department of Homeland Security (DHS) or the Social Security Administration (SSA) may terminate the Contractor's MOU and deny access to the E-Verify system in accordance with the terms of the MOU. In such case, the Contractor will be referred to a suspension or debarment official.

(ii) During the period between termination of the MOU and a decision by the suspension or debarment official whether to suspend or debar, the Contractor is excused from its obligations under paragraph (b) of this clause. If the suspension or debarment official determines not to suspend or debar the Contractor, then the Contractor must reenroll in E-Verify.

(c) Web site. Information on registration for and use of the E-Verify program can be obtained via the Internet at the Department of Homeland Security Web site: http://www.dhs.gov/E-Verify.

(d) Individuals previously verified. The Contractor is not required by this clause to perform additional employment verification using E-Verify for any employee--

(1) Whose employment eligibility was previously verified by the Contractor through the E-Verify program;

(2) Who has been granted and holds an active U.S. Government security clearance for access to confidential, secret, or top secret information in accordance with the National Industrial Security Program Operating Manual; or

(3) Who has undergone a completed background investigation and been issued credentials pursuant to Homeland Security Presidential Directive (HSPD)-12, Policy for a Common Identification Standard for Federal Employees and Contractors.

(e) Subcontracts. The Contractor shall include the requirements of this clause, including this paragraph (e) (appropriately modified for identification of the parties), in each subcontract that--

(1) Is for--(i) Commercial or noncommercial services (except for commercial services that are part of the purchase of a COTS item (or an item that would be a COTS item, but for minor modifications), performed by the COTS provider, and are normally provided for that COTS item); or

(ii) Construction;

(2) Has a value of more than $3,500; and

(3) Includes work performed in the United States.

(End of clause)

52.222-55  MINIMUM WAGES UNDER EXECUTIVE ORDER 13658 (DEC 2015)

(a) Definitions. As used in this clause--

``United States'' means the 50 states and the District of Columbia.

``Worker''--

(1) Means any person engaged in performing work on, or in connection with, a contract covered by Executive Order 13658, and --

(i) Whose wages under such contract are governed by the Fair Labor Standards Act (29 U.S.C. chapter 8), the Service Contract Labor Standards statute (41 U.S.C. chapter 67), or the Wage Rate Requirements (Construction) statute (40 U.S.C. chapter 31, subchapter IV);

(ii) Other than individuals employed in a bona fide executive, administrative, or professional capacity, as those terms are defined in 29 CFR part 541;

(iii) Regardless of the contractual relationship alleged to exist between the individual and the employer.

(2) Includes workers performing on, or in connection with, the contract whose wages are calculated pursuant to special certificates issued under 29 U.S.C. 214(c).

(3) Also includes any person working on, or in connection with, the contract and individually registered in a bona fide apprenticeship or training program registered with the Department of Labor's Employment and Training Administration, Office of Apprenticeship, or with a State Apprenticeship Agency recognized by the Office of Apprenticeship.

(b) Executive Order minimum wage rate. (1) The Contractor shall pay to workers, while performing in the United States, and performing on, or in connection with, this contract, a minimum hourly wage rate of $10.10 per hour beginning January 1, 2015.

(2)  The Contractor shall adjust the minimum wage paid, if necessary, beginning January 1, 2016, and annually thereafter, to meet the applicable annual E.O. minimum wage. The Administrator of the Department of Labor's Wage and Hour Division (the Administrator) will publish annual determinations in the Federal Register no later than

90 days before the effective date of the new E.O. minimum wage rate. The Administrator will also publish the applicable E.O. minimum wage on www.wdol.gov (or any successor Web site), and a general notice on all wage determinations issued under the Service Contract Labor Standards statute or the Wage Rate Requirements (Construction) statute, that will provide information on the E.O. minimum wage and how to obtain annual updates. The applicable published E.O. minimum wage is incorporated by reference into this contract.

(3)(i)  The Contractor may request a price adjustment only after the effective date of the new annual E.O. minimum wage determination. Prices will be adjusted only for increased labor costs (including subcontractor labor costs) as a result of an increase in the annual E.O. minimum wage, and for associated labor costs (including those for subcontractors). Associated labor costs shall include increases or decreases that result from changes in social security and unemployment taxes and workers' compensation insurance, but will not otherwise include any amount for general and administrative costs, overhead, or profit.

(ii) Subcontractors may be entitled to adjustments due to the new minimum wage, pursuant to paragraph (b)(2). Contractors shall consider any subcontractor requests for such price adjustment.

(iii) The Contracting Officer will not adjust the contract price under this clause for any costs other than those identified in paragraph (b)(3)(i) of this clause, and will not provideduplicate price adjustments with any price adjustment under clauses implementing the Service Contract Labor Standards statute or the Wage Rate Requirements (Construction) statute.

(4) The Contractor warrants that the prices in this contract do not include allowance for any contingency to cover increased costs for which adjustment is provided under this clause.

(5) A pay period under this clause may not be longer than semi-monthly, but may be shorter to comply with any applicable law or other requirement under this contract establishing a shorter pay period. Workers shall be paid no later than one pay period following the end of the regular pay period in which such wages were earned or accrued.

(6) The Contractor shall pay, unconditionally to each worker, all wages due free and clear without subsequent rebate or kickback. The Contractor may make deductions that reduce a worker's wages below the E.O. minimum wage rate only if done in accordance with 29 CFR 10.23, Deductions.

(7) The Contractor shall not discharge any part of its minimum wage obligation under this clause by furnishing fringe benefits or, with respect to workers whose wages are governed by the Service Contract Labor Standards statute, the cash equivalent thereof.

(8) Nothing in this clause shall excuse the Contractor from compliance with any applicable Federal or State prevailing wage law or any applicable law or municipal ordinance establishing a minimum wage higher than the E.O. minimum wage. However, wage increases under such other laws or municipal ordinances are not subject to price adjustment under this subpart.

(9) The Contractor shall pay the E.O. minimum wage rate whenever it is higher than any applicable collective bargaining agreement(s) wage rate.

(10) The Contractor shall follow the policies and procedures in 29 CFR 10.24(b) and 10.28 for treatment of workers engaged in an occupation in which they customarily and regularly receive more than $30 a month in tips.

(c)(1) This clause applies to workers as defined in paragraph (a). As provided in that definition--

(i) Workers are covered regardless of the contractual relationship alleged to exist between the contractor or subcontractor and the worker;

(ii) Workers with disabilities whose wages are calculated pursuant to special certificates issued under 29 U.S.C. 214(c) are covered; and

(iii) Workers who are registered in a bona fide apprenticeship program or training program registered with the Department of Labor's Employment and Training Administration, Office of Apprenticeship, or with a State Apprenticeship Agency recognized by the Office of Apprenticeship, are covered.

(2) This clause does not apply to--

(i) Fair Labor Standards Act (FLSA)-covered individuals performing in connection with contracts covered by the E.O., i.e. those individuals who perform duties necessary to the performance of the contract, but who are not directly engaged in performing the specific work called for by the contract, and who spend less than 20
percent of their hours worked in a particular workweek performing in connection with such contracts;

(ii) Individuals exempted from the minimum wage requirements of the FLSA under 29 U.S.C. 213(a) and 214(a) and (b), unless otherwise covered by the Service Contract Labor Standards statute, or the Wage Rate Requirements (Construction) statute. These individuals include but are not limited to--

(A) Learners, apprentices, or messengers whose wages are calculated pursuant to special certificates issued under 29 U.S.C. 214(a).

(B) Students whose wages are calculated pursuant to special certificates issued under 29 U.S.C. 214(b).

(C) Those employed in a bona fide executive, administrative, or professional capacity (29 U.S.C. 213(a)(1) and 29 CFR part 541).

(d) Notice. The Contractor shall notify all workers performing work on, or in connection with, this contract of the applicable E.O. minimum wage rate under this clause. With respect to workers covered by the Service Contract Labor Standards statute or the Wage Rate Requirements (Construction) statute, the Contractor may meet this requirement by posting, in a prominent and accessible place at the worksite, the applicable wage determination under those statutes. With respect to workers whose wages are governed by the FLSA, the Contractor shall post notice, utilizing the poster provided by the Administrator, which can be obtained at www.dol.gov/whd/govcontracts, in a prominent and accessible place at the worksite. Contractors that customarily post notices to workers electronically may post the notice electronically provided the electronic posting is displayed prominently on any Web site that is maintained by the contractor, whether external or internal, and customarily used for notices to workers about terms and conditions of employment.

(e) Payroll Records. (1) The Contractor shall make and maintain records, for three years after completion of the work, containing the following information for each worker:

(i) Name, address, and social security number;

(ii) The worker's occupation(s) or classification(s);

(iii) The rate or rates of wages paid;

(iv) The number of daily and weekly hours worked by each worker;

(v) Any deductions made; and

(vi) Total wages paid.

(2) The Contractor shall make records pursuant to paragraph (e)(1) of this clause available for inspection and transcription by authorized representatives of the Administrator. The Contractor shall also make such records available upon request of the Contracting Officer.

(3) The Contractor shall make a copy of the contract available, as applicable, for inspection or transcription by authorized representatives of the Administrator.

(4) Failure to comply with this paragraph (e) shall be a violation of 29 CFR 10.26 and this contract. Upon direction of the Administrator or upon the Contracting Officer's own action, payment shall be withheld until such time as the noncompliance is corrected.

(5) Nothing in this clause limits or otherwise modifies the Contractor's payroll and recordkeeping obligations, if any, under the Service Contract Labor Standards statute, the Wage Rate Requirements (Construction) statute, the Fair Labor Standards Act, or any other applicable law.

(f) Access. The Contractor shall permit authorized representatives of the Administrator to conduct investigations, including interviewing workers at the worksite during normal working hours.

(g) Withholding. The Contracting Officer, upon his or her own action or upon written request of the Administrator, will withhold funds or cause funds to be withheld, from the Contractor under this or any other Federal contract with the same Contractor, sufficient to pay workers the full amount of wages required by this clause.

(h) Disputes. Department of Labor has set forth in 29 CFR 10.51, Disputes concerning contractor compliance, the procedures for resolving disputes concerning a contractor's compliance with Department of Labor regulations at 29 CFR part 10. Such disputes shall be resolved in accordance with those procedures and not the Disputes clause of this contract. These disputes include disputes between the Contractor (or any of its subcontractors) and the contracting agency, the Department of Labor, or the workers or their representatives.

(i) Antiretaliation. The Contractor shall not discharge or in any other manner discriminate against any worker because such worker has filed any complaint or instituted or caused to be instituted any proceeding under or related to compliance with the E.O. or this clause, or has testified or is about to testify in any such proceeding.

(j) Subcontractor compliance. The Contractor is responsible for subcontractor compliance with the requirements of this clause and may be held liable for unpaid wages due subcontractor workers.

(k) Subcontracts. The Contractor shall include the substance of this clause, including this paragraph (k) in all subcontracts, regardless of dollar value, that are subject to the Service Contract Labor Standards statute or the Wage Rate Requirements (Construction) statute, and are to be performed in whole or in part in the United States.

(End of clause)


52.223-11     OZONE-DEPLETING SUBSTANCES (MAY 2001)

(a) Definition. Ozone-depleting substance, as used in this clause, means any substance the Environmental Protection Agency designates in 40 CFR part 82 as--

(1) Class I, including, but not limited to, chlorofluorocarbons, halons, carbon tetrachloride, and methyl chloroform; or

(2) Class II, including, but not limited to, hydrochlorofluorocarbons.

(b) The Contractor shall label products which contain or are manufactured with ozone-depleting substances in the manner and to the extent required by 42 U.S.C. 7671j (b), (c), and (d) and 40 CFR Part 82, Subpart E, as follows:

"WARNING: Contains (or manufactured with, if applicable), a substance(s) which harm(s) public health and

environment by destroying ozone in the upper atmosphere."---------------------------

The Contractor shall insert the name of the substance(s).

(End of clause)



52.225-9    BUY AMERICAN—CONSTRUCTION MATERIALS (MAY 2014)

(a) Definitions. As used in this clause--

Commercially available off-the-shelf (COTS) item—

(1) Means any item of supply (including construction material) that is--

(i) A commercial item (as defined in paragraph (1) of the definition at FAR 2.101);

(ii) Sold in substantial quantities in the commercial marketplace; and

(iii) Offered to the Government, under a contract or subcontract at any tier, without modification, in the same form in which it is sold in the commercial marketplace; and

(2) Does not include bulk cargo, as defined in 46 U.S.C. 40102(4) such as agricultural products and petroleum products.

Component means an article, material, or supply incorporated directly into a construction material.

Construction material means an article, material, or supply brought to the construction site by the Contractor or a subcontractor for incorporation into the building or work. The term also includes an item brought to the site preassembled from articles, materials, or supplies. However, emergency life safety systems, such as emergency lighting, fire alarm, and audio evacuation systems, that are discrete systems incorporated into a public building or work and that are produced as complete systems, are evaluated as a single and distinct construction material regardless of when or how the individual parts or components of those systems are delivered to the construction site. Materials purchased directly by the Government are supplies, not construction material.

Cost of components means--

(1) For components purchased by the Contractor, the acquisition cost, including transportation costs to the place of incorporation into the construction material (whether or not such costs are paid to a domestic firm), and any applicable duty (whether or not a duty-free entry certificate is issued); or

(2) For components manufactured by the Contractor, all costs associated with the manufacture of the component, including transportation costs as described in paragraph (1) of this definition, plus allocable overhead costs, but excluding profit. Cost of components does not include any costs associated with the manufacture of the construction material.

Domestic construction material means--

(1) An unmanufactured construction material mined or produced in the United States;

(2) A construction material manufactured in the United States, if--

(i) The cost of its components mined, produced, or manufactured in the United States exceeds 50 percent of the cost of all its components. Components of foreign origin of the same class or kind for which nonavailability determinations have been made are treated as domestic; or

(ii) The construction material is a COTS item.

Foreign construction material means a construction material other than a domestic construction material.

United States means the 50 States, the District of Columbia, and outlying areas.

(b) Domestic preference.

(1) This clause implements 41 U.S.C. chapter 83, Buy American, by providing a preference for domestic construction material. In accordance with 41 U.S.C. 1907, the component test of the Buy American statute is waived for construction material that is a COTS item. (See FAR 12.505(a)(2)). The Contractor shall use only domestic construction material in performing this contract, except as provided in paragraphs (b)(2) and (b)(3) of this clause.

(2)  This requirement does not apply to information technology that is a commercial item or to the construction materials or components listed by the Government as follows: None

(3) The Contracting Officer may add other foreign construction material to the list in paragraph (b)(2) of this clause if the Government determines that

(i) The cost of domestic construction material would be unreasonable. The cost of a particular domestic construction material subject to the requirements of the Buy American Act is unreasonable when the cost of such material exceeds the cost of foreign material by more than 6 percent;

(ii) The application of the restriction of the Buy American Act to a particular construction material would be impracticable or inconsistent with the public interest; or

(iii) The construction material is not mined, produced, or manufactured in the United States in sufficient and reasonably available commercial quantities of a satisfactory quality.

(c) Request for determination of inapplicability of the Buy American Act. (1)(i) Any Contractor request to use foreign construction material in accordance with paragraph (b)(3) of this clause shall include adequate information for Government evaluation of the request, including--

(A) A description of the foreign and domestic construction materials;

(B) Unit of measure;

(C) Quantity;

(D) Price;

(E) Time of delivery or availability;

(F) Location of the construction project;

(G) Name and address of the proposed supplier; and

(H) A detailed justification of the reason for use of foreign construction materials cited in accordance with paragraph (b)(3) of this clause.

(ii) A request based on unreasonable cost shall include a reasonable survey of the market and a completed price comparison table in the format in paragraph (d) of this clause.

(iii) The price of construction material shall include all delivery costs to the construction site and any applicable duty (whether or not a duty-free certificate may be issued).

(iv) Any Contractor request for a determination submitted after contract award shall explain why the Contractor could not reasonably foresee the need for such determination and could not have requested the determination before contract award. If the Contractor does not submit a satisfactory explanation, the Contracting Officer need not make a determination.

(2) If the Government determines after contract award that an exception to the Buy American statute applies and the Contracting Officer and the Contractor negotiate adequate consideration, the Contracting Officer will modify the contract to allow use of the foreign construction material. However, when the basis for the exception is the unreasonable price of a domestic construction material, adequate consideration is not less than the differential established in paragraph (b)(3)(i) of this clause.

(3) Unless the Government determines that an exception to the Buy American statute applies, use of foreign construction material is noncompliant with the Buy American statute.

(d) Data. To permit evaluation of requests under paragraph (c) of this clause based on unreasonable cost, the Contractor shall include the following information and any applicable supporting data based on the survey of suppliers:

Foreign and Domestic Construction Materials Price Comparison

| Construction material description | Unit of measure | Quantity | Price (dollars) \1\ |
|---|---|---|---|

Item 1
  Foreign construction material.... ........... ___ ........ ....... ………… ___ ............... ........ ___ ...............
  Domestic construction material... ........ ___ .............. ............. ___ ................. ...... ___ ................
Item 2
  Foreign construction material.... ......... ___ ............. ........ …….. ___ ............... ........ ___ ..............
  Domestic construction material... ....... ___ ............... ............. ___ ............... ....... ___ ...............

Include all delivery costs to the construction site and any applicable duty (whether or not a duty-free entry certificate is issued).
List name, address, telephone number, and contact for suppliers surveyed. Attach copy of response; if oral, attach summary.
Include other applicable supporting information.

(End of clause)

52.252-2    CLAUSES INCORPORATED BY REFERENCE (FEB 1998)

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at this/these address(es):

http://farsite.hill.af.mil/farsites.html

(End of clause)

52.252-4    ALTERATIONS IN CONTRACT (APR 1984)

Portions of this contract are altered as follows:

NONE

(End of clause)


252.201-7000    CONTRACTING OFFICER'S REPRESENTATIVE (DEC 1991)

(a) "Definition. Contracting officer's representative" means an individual designated in accordance with subsection 201.602-2 of the Defense Federal Acquisition Regulation Supplement and authorized in writing by the contracting officer to perform specific technical or administrative functions.

(b) If the Contracting Officer designates a contracting officer's representative (COR), the Contractor will receive a copy of the written designation. It will specify the extent of the COR's authority to act on behalf of the contracting officer. The COR is not authorized to make any commitments or changes that will affect price, quality, quantity, delivery, or any other term or condition of the contract.

(End of clause)


252.211-7003   ITEM UNIQUE IDENTIFICATION AND VALUATION (MAR 2016)

(a) Definitions. As used in this clause'

Automatic identification device means a device, such as a reader or interrogator, used to retrieve data encoded on machine-readable media.

Concatenated unique item identifier means--

(1) For items that are serialized within the enterprise identifier, the linking together of the unique identifier data elements in order of the issuing agency code, enterprise identifier, and unique serial number within the enterprise identifier; or

(2) For items that are serialized within the original part, lot, or batch number, the linking together of the unique identifier data elements in order of the issuing agency code; enterprise identifier; original part, lot, or batch number; and serial number within the original part, lot, or batch number.

Data Matrix means a two-dimensional matrix symbology, which is made up of square or, in some cases, round modules arranged within a perimeter finder pattern and uses the Error Checking and Correction 200 (ECC200) specification found within International Standards Organization (ISO)/International Electrotechnical Commission (IEC) 16022.

Data qualifier means a specified character (or string of characters) that immediately precedes a data field that defines the general category or intended use of the data that follows.

DoD recognized unique identification equivalent means a unique identification method that is in commercial use and has been recognized by DoD. All DoD recognized unique identification equivalents are listed at http://www.acq.osd.mil/dpap/pdi/uid/iuid_equivalents.html.

DoD item unique identification means a system of marking items delivered to DoD with unique item identifiers that have machine-readable data elements to distinguish an item from all other like and unlike items.  For items that are serialized within the enterprise identifier, the unique item identifier shall include the data elements of the enterprise identifier and a unique serial number.  For items that are serialized within the part, lot, or batch number within the enterprise identifier, the unique item identifier shall include the data elements of the enterprise identifier; the original part, lot, or batch number; and the serial number.

Enterprise means the entity (e.g., a manufacturer or vendor) responsible for assigning unique item identifiers to items.

Enterprise identifier means a code that is uniquely assigned to an enterprise by an issuing agency.

Government's unit acquisition cost means--

(1) For fixed-price type line, subline, or exhibit line items, the unit price identified in the contract at the time of delivery;

(2) For cost-type or undefinitized line, subline, or exhibit line items, the Contractor's estimated fully burdened unit cost to the Government at the time of delivery; and

(3) For items produced under a time-and-materials contract, the Contractor's estimated fully burdened unit cost to the Government at the time of delivery.

Issuing agency means an organization responsible for assigning a globally unique identifier to an enterprise, as indicated in the Register of Issuing Agency Codes for ISO/IEC 15459, located at http://www.aimglobal.org/?Reg_Authority15459.

Issuing agency code means a code that designates the registration (or controlling) authority for the enterprise identifier.

Item means a single hardware article or a single unit formed by a grouping of subassemblies, components, or constituent parts.

Lot or batch number means an identifying number assigned by the enterprise to a designated group of items, usually referred to as either a lot or a batch, all of which were manufactured under identical conditions.

Machine-readable means an automatic identification technology media, such as bar codes, contact memory buttons, radio frequency identification, or optical memory cards.

Original part number means a combination of numbers or letters assigned by the enterprise at item creation to a class of items with the same form, fit, function, and interface.

Parent item means the item assembly, intermediate component, or subassembly that has an embedded item with a unique item identifier or DoD recognized unique identification equivalent.

Serial number within the enterprise identifier means a combination of numbers, letters, or symbols assigned by the enterprise to an item that provides for the differentiation of that item from any other like and unlike item and is never used again within the enterprise.

Serial number within the part, lot, or batch number means a combination of numbers or letters assigned by the enterprise to an item that provides for the differentiation of that item from any other like item within a part, lot, or batch number assignment.

Serialization within the enterprise identifier means each item produced is assigned a serial number that is unique among all the tangible items produced by the enterprise and is never used again. The enterprise is responsible for ensuring unique serialization within the enterprise identifier.

Serialization within the part, lot, or batch number means each item of a particular part, lot, or batch number is assigned a unique serial number within that part, lot, or batch number assignment. The enterprise is responsible for ensuring unique serialization within the part, lot, or batch number within the enterprise identifier.

Type designation means a combination of letters and numerals assigned by the Government to a major end item, assembly or subassembly, as appropriate, to provide a convenient means of differentiating between items having the same basic name and to indicate modifications and changes thereto.

Unique item identifier means a set of data elements marked on items that is globally unique and unambiguous. The term includes a concatenated unique item identifier or a DoD recognized unique identification equivalent.

Unique item identifier type means a designator to indicate which method of uniquely identifying a part has been used. The current list of accepted unique item identifier types is maintained at http://www.acq.osd.mil/dpap/pdi/uid/uii_types.html.

(b) The Contractor shall deliver all items under a contract line, subline, or exhibit line item.

(c) Unique item identifier. (1) The Contractor shall provide a unique item identifier for the following:

(i) Delivered items for which the Government's unit acquisition cost is $5,000 or more, except for the following line items:

```
-----------------------------------------------------------------------
Contract line, subline, or exhibit
     line item No.                    Item description
-----------------------------------------------------------------------
                         ...................................
-----------------------------------------------------------------------
```

(ii) Items for which the Government's unit acquisition cost is less than $5,000 that are identified in the Schedule or the following table:

```
-----------------------------------------------------------------------
Contract line, subline, or exhibit
     line item No.                    Item description
-----------------------------------------------------------------------
                         ...................................
-----------------------------------------------------------------------
```

(If items are identified in the Schedule, insert ``See Schedule'' in this table.)

(iii) Subassemblies, components, and parts embedded within delivered items, items with warranty requirements, DoD serially managed reparables and DoD serially managed nonreparables as specified in Attachment Number ----.

(iv) Any item of special tooling or special test equipment as defined in FAR 2.101 that have been designated for preservation and storage for a Major Defense Acquisition Program as specified in Attachment Number ----.

(v) Any item not included in paragraphs (c)(1)(i), (ii), (iii), or

(iv) of this clause for which the contractor creates and marks a unique item identifier for traceability.

(2) The unique item identifier assignment and its component data element combination shall not be duplicated on any other item marked or registered in the DoD Item Unique Identification Registry by the contractor.

(3) The unique item identifier component data elements shall be marked on an item using two dimensional data matrix symbology that complies with ISO/IEC International Standard 16022, Information technology--International symbology specification--Data matrix; ECC200 data matrix specification.

(4) Data syntax and semantics of unique item identifiers. The Contractor shall ensure that--

(i) The data elements (except issuing agency code) of the unique item identifier are encoded within the data matrix symbol that is marked on the item using one of the following three types of data qualifiers, as determined by the Contractor:

(A) Application Identifiers (AIs) (Format Indicator 05 of ISO/IEC International Standard 15434), in accordance with ISO/IEC International Standard 15418, Information Technology--EAN/UCC Application Identifiers and Fact Data Identifiers and Maintenance and ANSI MH 10.8.2 Data Identifier and Application Identifier Standard.

(B) Data Identifiers (DIs) (Format Indicator 06 of ISO/IEC International Standard 15434), in accordance with ISO/IEC International Standard 15418, Information Technology--EAN/UCC Application Identifiers and Fact Data Identifiers and Maintenance and ANSI MH 10.8.2 Data Identifier and Application Identifier Standard.

(C) Text Element Identifiers (TEIs) (Format Indicator 12 of ISO/IEC International Standard 15434), in accordance with the Air Transport Association Common Support Data Dictionary; and

(ii) The encoded data elements of the unique item identifier conform to the transfer structure, syntax, and coding of messages and data formats specified for Format Indicators 05, 06, and 12 in ISO/IEC International Standard 15434, Information Technology-Transfer Syntax for High Capacity Automatic Data Capture Media.

(5) Unique item identifier.

(i) The Contractor shall--

(A) Determine whether to--

(1) Serialize within the enterprise identifier;

(2) Serialize within the part, lot, or batch number; or

(3) Use a DoD recognized unique identification equivalent (e.g. Vehicle Identification Number); and

(B) Place the data elements of the unique item identifier (enterprise identifier; serial number; DoD recognized unique
identification equivalent; and for serialization within the part, lot, or batch number only: Original part, lot, or batch number) on items requiring marking by paragraph (c)(1) of this clause, based on the criteria provided in MIL-STD-130, Identification Marking of U.S. Military Property, latest version;

(C) Label shipments, storage containers and packages that contain uniquely identified items in accordance with the requirements of MIL-STD-129, Military Marking for Shipment and Storage, latest version; and

(D) Verify that the marks on items and labels on shipments, storage containers, and packages are machine readable and conform to the applicable standards. The contractor shall use an automatic identification technology device for this verification that has been programmed to the requirements of Appendix A, MIL-STD-130, latest version.

(ii) The issuing agency code--

(A) Shall not be placed on the item; and

(B) Shall be derived from the data qualifier for the enterprise identifier.

(d) For each item that requires item unique identification under paragraph (c)(1)(i), (ii), or (iv) of this clause or when item unique identification is provided under paragraph (c)(1)(v), in addition to the information provided as part of the Material Inspection and Receiving Report specified elsewhere in this contract, the Contractor shall report at the time of delivery, as part of the Material Inspection and Receiving Report, the following information:

(1) Unique item identifier.

(2) Unique item identifier type.

(3) Issuing agency code (if concatenated unique item identifier is used).

(4) Enterprise identifier (if concatenated unique item identifier is used).

(5) Original part number (if there is serialization within the original part number).

(6) Lot or batch number (if there is serialization within the lot or batch number).

(7) Current part number (optional and only if not the same as the original part number).

(8) Current part number effective date (optional and only if current part number is used).

(9) Serial number (if concatenated unique item identifier is used).

(10) Government's unit acquisition cost.

(11) Unit of measure.

(e) For embedded subassemblies, components, and parts that require DoD unique item identification under paragraph (c)(1)(iii) of this clause, the Contractor shall report as part of, or associated with, the Material Inspection and Receiving Report specified elsewhere in this contract, the following information:

(1) Unique item identifier of the parent item under paragraph (c)(1) of this clause that contains the embedded subassembly, component, or part.

(2) Unique item identifier of the embedded subassembly, component, or part.

(3) Unique item identifier type.**

(4) Issuing agency code (if concatenated unique item identifier is used).**

(5) Enterprise identifier (if concatenated unique item identifier is used).**

(6) Original part number (if there is serialization within the original part number).**

(7) Lot or batch number (if there is serialization within the lot or batch number).**

(8) Current part number (optional and only if not the same as the original part number).**

(9) Current part number effective date (optional and only if current part number is used).**

(10) Serial number (if concatenated unique item identifier is used).**

(11) Description.

(12) Type designation of the item as specified in the contract schedule, if any.

(13) Whether the item is an item of Special Tooling or Special Test Equipment.

(14) Whether the item is covered by a warranty.

** Once per item.

(e) For embedded subassemblies, components, and parts that require DoD item unique identification under paragraph (c)(1)(iii) of this clause or when item unique identification is provided under paragraph (c)(1)(v), the Contractor shall report as part of the Material Inspection and Receiving Report specified elsewhere in this contract, the following information:

(f) The Contractor shall submit the information required by paragraphs (d) and (e) of this clause as follows:

(1) End items shall be reported using the receiving report capability in Wide Area WorkFlow (WAWF) in accordance with the clause at 252.232-7003. If WAWF is not required by this contract, and the contractor is not using WAWF, follow the procedures at http://dodprocurementtoolbox.com/site/uidregistry/.

(2) Embedded items shall be reported by one of the following methods--

(i) Use of the embedded items capability in WAWF;

(ii) Direct data submission to the IUID Registry following the procedures and formats at http://dodprocurementtoolbox.com/site/uidregistry/; or

(iii) Via WAWF as a deliverable attachment for exhibit line item number (fill in) ----, Unique Item Identifier Report for Embedded Items, Contract Data Requirements List, DD Form 1423.

(g) Subcontracts. If the Contractor acquires by contract any items for which item unique identification is required in accordance with paragraph (c)(1) of this clause, the Contractor shall include this clause, including this paragraph (g), in the applicable subcontract(s), including subcontracts for commercial items.

(End of clause)


252.232-7003 Electronic Submission of Payment Requests and Receiving Reports.

As prescribed in 232.7004(a), use the following clause:

ELECTRONIC SUBMISSION OF PAYMENT REQUESTS
AND RECEIVING REPORTS (DEVIATION 2016-AOOOl) (NOV 2015)

(a) *Definitions.* As used in this clause-

(1) "Electronic form" means any automated system that transmits information electronically from the initiating system to all affected systems. Facsimile, e-mail, and scanned documents are not acceptable electronic forms for submission of payment requests. However, scanned documents are acceptable when they are part of a submission of a payment request made using Wide Area WorkFlow (WAWF) or another electronic form authorized by the Contracting Officer.

(2) "Invoice payment" has the meaning given in section 32.001 of the Federal Acquisition Regulation.

(3) "Payment request" means any request for invoice payment submitted by the Contractor under this contract.

(4) "Receiving report" means the data required by the clause at 252.246- 7000, Material Inspection and Receiving Report.

(b) Except as provided in paragraph (c) of this clause the Contractor shall submit payment requests and receiving reports using WAWF, in one of the following electronic formats that WAWF accepts: Electronic Data Interchange, Secure File Transfer Protocol, or World Wide Web input. Information regarding WAWF is available on the Internet at https://wawf.eb.mil/.

(c) The Contractor may submit a payment request and receiving report using other than WAWF only when-

(1) The Contracting Officer administering the contract for payment has determined, in writing, that electronic submission would be unduly burdensome to the Contractor. In such cases, the Contractor shall include a copy of the Contracting Officer's determination with each request for payment;

(2) DoD makes payment for commercial transportation services provided under a Government rate tender or a contract for transportation services using a DoD-approved electronic third party payment system or other exempted vendor payment/invoicing system (e.g., PowerTrack, Transportation Financial Management System, and Cargo and Billing System);

(3) DoD makes payment for rendered health care services using the TRICARE Encounter Data System (TEDS) as the electronic format;

(4) The Governmentwide commercial purchase card is used as the method

of payment, only submission of the receiving report in electronic form is required; or

(5) Submitting payment requests and receiving reports to the Supplier Self- Services (SUS) system accessible via the Wide Area WorkFlow (WAWF) website as an authorized participant in the vendor portal invoicing pilot program.

(d)  The Contractor shall submit any non-electronic payment requests using the method or methods specified in Section G of the contract.

(e)  In addition to the requirements of this clause, the Contractor shall meet the. requirements of the appropriate payment clauses in this contract when submitting payment requests.

(End of clause)

252.232-7006 WIDE AREA WORKFLOW PAYMENT INSTRUCTIONS (MAY 2013)

(a) Definitions. As used in this clause--

Department of Defense Activity Address Code (DoDAAC) is a six position code that uniquely identifies a unit, activity, or organization.

Document type means the type of payment request or receiving report available for creation in Wide Area WorkFlow (WAWF).

Local processing office (LPO) is the office responsible for payment certification when payment certification is done external to the entitlement system.

(b) Electronic invoicing. The WAWF system is the method to electronically process vendor payment requests and receiving reports, as authorized by DFARS 252.232-7003, Electronic Submission of Payment Requests and Receiving Reports.

(c) WAWF access. To access WAWF, the Contractor shall--

(1) Have a designated electronic business point of contact in the System for Award Management at https://www.acquisition.gov; and

(2) Be registered to use WAWF at https://wawf.eb.mil/ following the step-by-step procedures for self-registration available at this Web site.

(d) WAWF training. The Contractor should follow the training instructions of the WAWF Web-Based Training Course and use the Practice Training Site before submitting payment requests through WAWF. Both can be accessed by selecting the "Web Based Training" link on the WAWF home page at https://wawf.eb.mil/.

(e) WAWF methods of document submission. Document submissions may be via Web entry, Electronic Data Interchange, or File Transfer Protocol.

(f) WAWF payment instructions. The Contractor must use the following information when submitting payment requests and receiving reports in WAWF for this contract/order:

(1) Document type. The Contractor shall use the following document type(s).

      Construction Invoice

(2) Inspection/acceptance location. The Contractor shall select the following inspection/acceptance location(s) in WAWF, as specified by the contracting officer.

      W45NQ9

(3) Document routing. The Contractor shall use the information in the Routing Data Table below only to fill in applicable fields in WAWF when creating payment requests and receiving reports in the system.

Routing Data Table*

| Field Name in WAWF | Data to be entered in WAWF |
|---|---|
| Pay Official DoDAAC | HQ0490 |
| Issue By DoDAAC | W91151 |
| Admin DoDAAC | W91151 |
| Inspect By DoDAAC | W45NQ9 |
| Ship To Code | W45NQ9 |
| Ship From Code | 1D3W0 |
| Mark For Code | N/A |
| Service Approver (DoDAAC) | N/A |
| Service Acceptor (DoDAAC) | N/A |
| Accept at Other DoDAAC | N/A |
| LPO DoDAAC | N/A |
| DCAA Auditor DoDAAC | N/A |
| Other DoDAAC(s) | N/A |

(4) Payment request and supporting documentation. The Contractor shall ensure a payment request includes appropriate contract line item and subline item descriptions of the work performed or supplies delivered, unit price/cost per unit, fee (if applicable), and all relevant back-up documentation, as defined in DFARS Appendix F, (e.g. timesheets) in support of each payment request.

(5) WAWF email notifications. The Contractor shall enter the email address identified below in the "Send Additional Email Notifications" field of WAWF once a document is submitted in the system.

      Contract Specialist   roy.r.cantrell2.civ@mail.mil

(g) WAWF point of contact. (1) The Contractor may obtain clarification regarding invoicing in WAWF from the following contracting activity's WAWF point of contact.

      Theresa A. Marcil   theresa.a.marcil.civ@mail.mil

(2) For technical WAWF help, contact the WAWF helpdesk at 866-618-5988.

(End of clause)

252.232-7010    LEVIES ON CONTRACT PAYMENTS (DEC 2006)

(a) 26 U.S.C. 6331(h) authorizes the Internal Revenue Service (IRS) to continuously levy up to 100 percent of contract payments, up to the amount of tax debt.

(b) When a levy is imposed on a payment under this contract and the Contractor believes that the levy may result in an inability to perform the contract, the Contractor shall promptly notify the Procuring Contracting Officer in writing, with a copy to the Administrative Contracting Officer, and shall provide--

(1) The total dollar amount of the levy;

(2) A statement that the Contractor believes that the levy may result in an inability to perform the contract, including rationale and adequate supporting documentation; and

(3) Advice as to whether the inability to perform may adversely affect national security, including rationale and adequate supporting documentation.

(c) DoD shall promptly review the Contractor's assessment, and the Procuring Contracting Officer shall provide a written notification to the Contractor including--

(1) A statement as to whether DoD agrees that the levy may result in an inability to perform the contract; and

(2)(i) If the levy may result in an inability to perform the contract and the lack of performance will adversely affect national security, the total amount of the monies collected that should be returned to the Contractor; or

(ii) If the levy may result in an inability to perform the contract but will not impact national security, a recommendation that the Contractor promptly notify the IRS to attempt to resolve the tax situation.

(d) Any DoD determination under this clause is not subject to appeal under the Contract Disputes Act.

(End of clause)

252.236-7001    CONTRACT DRAWINGS AND SPECIFICATIONS (AUG 2000)

(a) The Government will provide to the Contractor, without charge, one set of contract drawings and specifications, except publications incorporated into the technical provisions by reference, in electronic or paper media as chosen by the Contracting Officer.

(b) The Contractor shall--

(1) Check all drawings furnished immediately upon receipt;

(2) Compare all drawings and verify the figures before laying out the work;

(3) Promptly notify the Contracting Officer of any discrepancies;

(4) Be responsible for any errors that might have been avoided by complying with this paragraph (b); and

(5) Reproduce and print contract drawings and specifications as needed.

(c) In general--

(1) Large-scale drawings shall govern small-scale drawings; and

(2) The Contractor shall follow figures marked on drawings in preference to scale measurements.

(d) Omissions from the drawings or specifications or the misdescription of details of work that are manifestly necessary to carry out the intent of the drawings and specifications, or that are customarily performed, shall not relieve the Contractor from performing such omitted or misdescribed details of the work. The Contractor shall perform such details as if fully and correctly set forth and described in the drawings and specifications.

(e) The work shall conform to the specifications and the contract drawings identified on the following index of drawings:

| Drawing No. | Title |
| --- | --- |
| G-101 | Cover Sheet |
| C-101 | Site Plan - Utilities |
| C-102 | Site Plan - Improvements |
| C-105 | Site Plan - Enlarged Plans |
| C-501 | Civil Details |
| D-101 | First Floor Demo Plan |
| D-102 | Second Floor Demo Plan |
| D-103 | First Floor Mechanical Plan - Area B |
| D-104 | Upper First Floor Mechanical Plan - Area A |
| A-001 | Architectural General Notes |
| A-101 | First Floor Floor Plan |
| A-102 | Second Floor Floor Plan |
| A-105 | Enlarged Latrine Plans |
| A-106 | Racquetball Court Plan and Notes |
| A-301 | Wall Types |
| A-501 | Architectural Details |
| A-602 | Room Finish and Window Schedules |
| A-603 | Door and Hardware Schedule |
| M-101 | First Floor Mechanical Plan - Area A |
| M-102A | Upper First Floor Mechanical Plan - Area A |
| M-102B | Upper First Floor Mechanical Plan - Area B |
| M-501 | Mechanical Details |
| M-601 | Mechanical Schedules |
| M-602 | Mechanical Controls |
| M-701 | Heating and Chill Systems Control |
| M-702 | AHU Control Diagram |
| P-101 | First Floor - Area A Plumbing |
| P-102 | First Floor - Area B Plumbing |
| E-101 | First Floor - Area A Power and Fire |
| E-102 | First Floor - Area B Power and Fire |
| E-103 | Second Floor Power and Fire |
| E-104 | First Floor - Area A Lighting |
| E-105 | First Floor - Area B Lighting |
| E-106 | Second Floor Lighting |

1967 As-builts

| 31-06-01 | Plate 9 Architectural Floor Plan |
| 31-06-01 | Sheet 22 Electrical Floor Plan Power Telephone and Public Address |
| 31-06-01 | Plate 28 Mechanical Plumbing - partial Floor Plan Schedule, Legend & Details |
| 31-06-01 | Plate 30 Mechanical Floor Plans Heating & Sections |
| 31-06-01 | Plate 29 Mechanical Floor Plan |
| 31-06-01 | Plate 26 Electrical Floor Plan - Lighting |
| 31-06-01 | Floor Section |
| 31-06-01 | Structural - Foundation & First Floor Plan Details |
| 31-06-01 | Structural - Roof Framing Plan |

1977 As-builts
| DFE 5258.25 | Sheet 28 - Equipment Location Plan & Details |

1985 As-builts
| Sheet A-2 of 31 | Demolition Floor Plans |
| Sheet M-1 of 25 | Mechanical & Plumbing |
| Sheet E-15 of 18 | Electrical Notes & Schedule |
| Sheet E-3 of 18 | First Floor Lighting & Power New Construction |
| Sheet E-2 of 18 | First Floor & Mezz Level Lighting & Power Demolition |
| Sheet A-3 of 31 | New Construction Floor Plans |

1996 As-builts
| 00584880 | A6 0f 9A Renovation Elevations |
| 00585000 | E3 of 4E Power Renovation Plan |
| 00584930 | P2 of 3P Plumbing Plan |
| 00584940 | P3 of 3P Plumbing Schedule & Details |
| 00584920 | P1 of 3P Plumbing Demolition Plan |
| 00584950 | M1 of 3M HVAC Demolition Plans |
| 00584990 | E2 of 4E Lighting Renovation Plan |
| 00584980 | E1 of 4E Electrical Demolition Plan |

2003 As-builts
| 3a36me2 | Sheet#:  ME2 HVAC Renovations |

2004 As-builts
| 00641870 | Electrical Plan |

(End of clause)


**5152.204-4001  KEY PERSONNEL REQUIREMENTS (MAR 2009) (LOCAL CLAUSE)**

(a)  Certain experienced professional and/or technical personnel are essential for successful accomplishment of the work to be performed under this contract. These "Key Personnel" were identified by name within the contractor's proposal and their resumes were submitted for evaluation during the source selection process. The contractor agrees that such personnel shall not be removed or replaced within the performance of this contract unless the following measures are taken:

        (1)  If one or more of the key personnel, for any reason, becomes or is expected to become unavailable for work under this contract for a continuous period exceeding 30 work days, or is expected to devote substantially less effort to the work than indicated in the proposal or initially anticipated, the contractor shall, subject to the concurrence of the Contracting Officer (KO) or designated Contracting Officer Representative (COR), promptly replace personnel with personnel who possess equal, or better,

qualifications as the original employee

(2)  All requests for approval of substitutions hereunder must be in writing and provide a detailed explanation of the circumstances necessitating the proposed substitutions. The request must contain a resume for the proposed substitute, and any other information requested by the KO or designated COR. The KO or designated COR must concur in writing with the change.

(b)  If the KO or designated COR determines that suitable and timely replacement of Key Personnel who have been reassigned, terminated or have otherwise become unavailable for the contract work is not reasonably forthcoming or that the resultant reduction of productive effort would be so substantial as to impair successful completion of the contract, the KO may terminate the contract for default or for the convenience of the Government, as appropriate, or make an equitable adjustment to the contract to compensate the Government for any resultant delay, loss or damage.

(c)  The Key Personnel in this contract are as follows:  Superintendent and Quality Control Manager.


**5152.233-4000  AMC-LEVEL PROTEST PROGRAM (NOV 2008) (LOCAL CLAUSE)**

If you have complaints about this procurement, it is preferable that you first attempt to resolve those concerns with the responsible contracting officer.  However, you can also protest to Headquarters, AMC. The HQ, AMC-Level Protest Program is intended to encourage interested parties to seek resolution of their concerns within AMC as an Alternative Dispute Resolution forum, rather than filing a protest with the Government Accountability Office or other external forum.  Contract award or performance is suspended during the protest to the same extent, and within the same time periods, as if filed at the GAO.  The AMC protest decision goal is to resolve protests within 20 working days from filing.  To be timely, protests must be filed within the periods specified in FAR 33.103. If you want to file a protest under the AMC-Level Protest Program, the protest must request resolution under that program and be sent to the address below.  All other agency-level protests should be sent to the contracting officer for resolution.

HQ Army Material Command
Office of Command Counsel
9301 Chapek Rd, Room 2-1SE3401
Ft. Belvoir, VA 22060-5527
Facsimile number (703) 806-8866 or 8875

Packages sent by FedEx or UPS should be addressed to:
HQ Army Material Command
Office of Command Counsel
Room 2-1SE3401
1412 Jackson Loop
Ft. Belvoir, VA 22060-5527

The AMC-Level Protest procedures are found at: http://www.amc.army.mil/pa/COMMANDCOUNSEL.asp.

If internet access is not available, contact the contracting officer or HQ, AMC to obtain the AMC-Level Protest Procedures.

Section 00800 - Special Contract Requirements

ADDITIONAL TERMS & CONDITIONS
**CONSTRUCTION CONTRACT PROGRESS PAYMENT REQUESTS**

   The Contractor shall read and be familiar with FAR Clause 52.232-5, Payments Under Fixed Price Construction Contracts, and 52.232-27, Prompt Payment for Construction Contracts.

   **FAR Clause 52.232-5** stipulates that the Government shall make progress payments monthly as work proceeds.  Each progress payment request shall include all of the elements delineated at sub-paragraph (b)(1)(i)-(v).  Failure to comply with the minimum requirements in this reference will result in immediate rejection of the invoice until corrected.

   Further sub-paragraph (e), Retainage, will be enforced. Relating back to the requirements for an appropriately detailed progress schedule, progress reports and progress payment requests shall be prepared in the same format as the approved progress schedule.  Every definable element of work will be shown on every progress report and every payment request.  For every element of work not completed by the approved time (late performance), the Contracting Officer will retain the maximum 10% of the amount of the payment of each incident of late performance until the work is satisfactorily completed and inspected in accordance with instructions and standards identified elsewhere in this contract.

   Further, sub-paragraph (g), Reimbursement for bond premiums, will be enforced.  The contractor shall provide evidence of payment of bond premiums paid to the surety (including coinsurance and reinsurance) before being allowed to submit for reimbursement of those expenditures in a progress payment request.

   **FAR Clause 52.232-27** (a)(i)(A) discusses the due date for making progress payments as 14 days after the designated billing office receives a PROPER payment request (see discussion above).  The Contracting Officer will date/time stamp receipt of each progress payment request package when it is delivered.  That date/time will mark day one of the 14-day period for payment IF there is no disagreement over quantity, quality, or contractor compliance with contract requirements.  If there is a disagreement in quantity, quality, or contractor compliance with any aspects of the contract at the time of delivery of the invoice, the invoice date/time stamp will be stricken through, initialed and returned to the contractor for correction.  This effectively stops the clock and it will start over when a properly executed invoice is delivered to the Contracting Officer.

In accordance with DFARS 252.232-7003, the Contracting Officer hereby determines that the following process is in compliance with DFARS:  Once the invoice has been certified by the Contracting Officer, AND the contractor receives a signed copy, the contractor shall initiate a Construction Payment Invoice in WAWF, and route it directly to the COR identified in this contract.  The DODAAC that will be used in preparing the WAWF invoice is "W45NQ9".  When the COR receives the WAWF invoice, he/she will verify the information submitted with the (local progress payment request form) approved  invoice; if all information between the two documents is verified as correct and appropriate, the COR will perform the role of Acceptor, and approve the invoice forward to the DFAS for  processing of the payment.

For contracts with a period of performance of 60 days or less the Contracting Officer has determined that no progress payment will be authorized. The Contractor shall be entitled to bill the Government for such projects only after completing a final inspection (and clearing any punch list generated), completion of any applicable O&M classes (to be coordinated with the COR), submission of final paperwork (i.e., as built drawings, DD 1354), and after confirming all certified payroll records have been submitted to the Government.

For projects negotiated with a longer performance period, progress payments are authorized one time each month, up to 80% of the project cost, but only after approval of a construction progress schedule, and only in the amounts verified on subsequently approved progress reports.  Progress payment invoices

will not be processed in the same week as the progress report is submitted.  No progress payments are authorized above 80% of the contract value.


## AVAILABILITY AND USE OF UTILITY SERVICES

a. In accordance with FAR Clause 52.236-14, Availability and Use of Utility Services, water and electricity are furnished by the Government for the Contractor's use at no charge and in the performance of construction work at the job site, but only to the extent that their use is necessary to complete the work and the utilities are readily available at the site.  Any usage of these utilities beyond what is needed to complete construction work at the job site or exceeds that which is readily available at the job site, and approved for use by the Contracting Officer, shall be furnished by the Contractor at its own expense.  These utilities are provided provisionally and only to the extent that is necessary to facilitate the work.  This authority can be revoked if the Government witnesses that utilities are being wasted; e.g., lights being left on when no work is being done or water is being left on unattended for any extended amount of time.  Failure of the Contractor to comply with this request to conserve and preserve these utilities will result in the Contractor entering into individual metering agreements at the job site and paying for the use of these utilities.

b. In reference to FAR Clause 52.236-10, Operations and Storage Areas, SHOULD the Contractor be AUTHORIZED to establish a field operations office or a temporary staging area under this contract, it shall be responsible for consumption of available utilities.  Prior to commencement of work under the contract, the contractor shall sign a utility metering agreement with the Directorate of Public Works Utilities Section, Bldg 4612 on 77th Street and Santa Fe Avenue.  Prior to final payment under the contract, the contractor shall pay any outstanding utility charges and provide a copy of the paid invoice to the Contracting Officer as evidence of compliance. .  If the solicitation does not provide for such arrangements, and the contractor did not receive separate approval for the establishment of such facilities/space from the Contracting Officer, no such authorization is assumed.  Any costs incurred for the establishment of field operations facilities after contract award are made solely at the contractor's cost, and without compensation by the Government.  There shall be no squatting on the job site.


## WRITTEN GUARANTEES AND GUARANTOR'S REPRESENTATIVE

The Government is entitled to all standard commercially offered warranties/guarantees.  The Contractor shall obtain all warranties, have them executed in writing, and furnish them to the Contracting Officer prior to final inspection.  Additionally, the documentation shall include the name, address, and telephone number of the guarantor's representative responsible for the guarantee during the warranted period, and who will provide warranty related services covered by the warranty/guarantee.  The existence of any commercial manufacturer's warranties does not relieve the contractor of responsibilities indentified in FAR clause 52.246-21.


## DOCUMENTATION TO SUPPORT SUBCONTRACT AWARDS

a. Within five calendar days after the award of any subcontract, the Contractor shall deliver a completed SF Form 1413 (Statement and Acknowledgment) to the Contracting Officer.  Each subcontract shall contain, as a minimum, the Contract Number, Task Order Number (if applicable), and Title.  The subcontract must clearly identify what the subcontractor will be performing in relation to other trades on the job.  All subcontracts shall contain the anticipated period of performance that correlates with the approved Progress Schedule for that Division of work.  A sample format shall be submitted for Contracting Officer approval prior to commencement of work under this contract.

b.  FAR Clause 52.222-11, entitled "Subcontracts (Labor Standards)", requires that the clauses listed therein be physically inserted in all subcontracts.  However, if the Contractor subcontracts by means

of purchase orders or other informal types of contractual situations, compliance will be considered provided if clauses are attached to the subcontract form.  <u>Written acknowledgement by the subcontractor of these Labor Standards is required. Incorporation by reference does not constitute compliance.</u>

**RELATIONSHIP BETWEEN GOVERNMENT, CONTRACTOR AND CONTRACTOR PERSONNEL**

a. The Government and the Contractor understand and agree that the services to be delivered under this contract are non-personal services and that no employer-employee or master-servant relationship exists or will exist under the contract between the Government and the Contractor or between the Government and the Contractor's personnel.  Further, the Contractor is not the Government's agent.

b. The Government will not exercise any supervision or control over Contractor personnel performing services under this contract.  Contractor personnel shall not become an integrated part of the Government organization in connection with performance under this contract.

c.  The work required under this contract does not require or authorize the Contractor or his employees to exercise personal judgment and discretion on behalf of the Government, but rather, the Contractor's employees shall act and exercise personal judgment and discretion on behalf of the Contractor.

d. Contractor personnel shall not be eligible, by virtue of performance under this contract, for payment by the Government of entitlements and benefits accorded federal employees.  The entire consideration to the Contractor for performance of this contract is contained in the provisions for payment set forth in this contract.

<u>TX WAGE DETERMINATION</u>
General Decision Number: TX160279 01/08/2016  TX279

Superseded General Decision Number: TX20150279

State: Texas

Construction Type: Building

County: Bell County in Texas.

BUILDING CONSTRUCTION PROJECTS (does not include single family homes or apartments up to and including 4 stories).

Note: Under Executive Order (EO) 13658, an hourly minimum wage of $10.15 for calendar year 2016 applies to all contracts subject to the Davis-Bacon Act for which the solicitation was issued on or after January 1, 2015. If this contract is covered by the EO, the contractor must pay all workers in any classification listed on this wage determination at least $10.15 (or the applicable wage rate listed on this wage determination, if it is higher) for all hours spent performing on the contract in calendar year 2016. The EO minimum wage rate will be adjusted annually. Additional information on contractor requirements and worker protections under the EO is available at www.dol.gov/whd/govcontracts.

34

Modification Number    Publication Date
        0        01/08/2016

BOIL0074-003 01/01/2014

|  | Rates | Fringes |
|---|---|---|
| BOILERMAKER........................... | $ 23.14 | 21.55 |

--------------------------------------------------------------

ENGI0178-005 06/01/2014

|  | Rates | Fringes |
|---|---|---|
| POWER EQUIPMENT OPERATOR | | |
| (1) Tower Crane...................... | $ 29.00 | 10.60 |
| (2) Cranes with Pile Driving or Caisson Attachment and Hydraulic Crane 60 tons and above........ | $ 28.75 | 10.60 |
| (3) Hydraulic cranes 59 Tons and under...................... | $ 27.50 | 10.60 |

--------------------------------------------------------------

* IRON0084-011 06/01/2015

|  | Rates | Fringes |
|---|---|---|
| IRONWORKER, ORNAMENTAL. | $ 23.02 | 6.35 |

--------------------------------------------------------------

PLUM0286-011 06/01/2015

|  | Rates | Fringes |
|---|---|---|
| PIPEFITTER (Excludes HVAC Pipe Installation)........................... | $ 28.00 | 11.41 |

--------------------------------------------------------------

SUTX2014-005 07/21/2014

|  | Rates | Fringes |
|---|---|---|
| BRICKLAYER......................$ 19.09 | | 0.00 |
| CARPENTER, Excludes Drywall Hanging, and Metal Stud Installation......................... | $ 17.28 | 1.71 |
| CEMENT MASON/CONCRETE FINISHER...$ 14.00 | | 0.00 |
| DRYWALL HANGER AND METAL STUD INSTALLER......................$ 14.59 | | 0.00 |
| ELECTRICIAN (Low Voltage Wiring Only)...................... | $ 28.28 | 2.44 |

ELECTRICIAN, Excludes Low

Voltage Wiring...................   $ 20.50        2.71

HVAC MECHANIC (HVAC Pipe
Installation Only)................   $ 15.50        0.00

HVAC MECHANIC (Installation
of HVAC Unit Only)............   $ 16.01        1.56

INSULATOR - MECHANICAL
(Duct, Pipe & Mechanical
System Insulation).............   $ 19.77        7.13

IRONWORKER, REINFORCING..........$ 13.35        0.00

IRONWORKER, STRUCTURAL...........$ 18.35        4.90

LABORER:  Common or General......$ 10.53        0.00

LABORER:  Mason Tender - Brick...$ 9.98         0.00

LABORER:  Mason Tender -
Cement/Concrete..............   $ 9.93         0.00

LABORER:  Pipelayer.......   $ 12.49        2.13

LABORER:  Roof Tearoff..   $ 11.28        0.00

OPERATOR:
Backhoe/Excavator/Trackhoe.......$ 13.10        1.24

OPERATOR:  Bobcat/Skid
Steer/Skid Loader..............   $ 13.93        0.00

OPERATOR:  Bulldozer....   $ 18.29        1.31

OPERATOR:  Drill.............   $ 16.22        0.34

OPERATOR:  Forklift........   $ 14.00        0.00

OPERATOR:  Grader/Blade..........$ 14.34        1.68

OPERATOR:  Loader........   $ 13.88        0.44

OPERATOR:  Mechanic.....$ 17.52        3.33

OPERATOR:  Paver  (Asphalt,
Aggregate, and Concrete).........$ 16.03        0.00

OPERATOR:  Roller..........   $ 13.11        0.00

PAINTER (Brush, Roller, and
Spray)...............................   $ 15.00        0.81

PLUMBER, Excludes HVAC Pipe
Installation.........................   $ 21.18        7.57

```
ROOFER..........................     $ 13.75          0.00

SHEET METAL WORKER (HVAC Duct
Installation Only)................    $ 18.71          4.90

SHEET METAL WORKER, Excludes
HVAC Duct Installation......          $ 14.89          1.55

SPRINKLER FITTER (Fire
Sprinklers)........................   $ 15.46          0.00

TILE FINISHER.................         $ 11.22          0.00

TILE SETTER....................        $ 14.74          0.00

TRUCK DRIVER:  Dump Truck........$ 11.50           1.10

TRUCK DRIVER:  Flatbed Truck.....$ 19.65            8.57

TRUCK DRIVER:  Semi-Trailer
Truck.................................  $ 12.50          0.00

TRUCK DRIVER:  Water Truck.......$ 12.00           4.11
```
----------------------------------------------------------------

WELDERS - Receive rate prescribed for craft performing
operation to which welding is incidental.

================================================================


Unlisted classifications needed for work not included within
the scope of the classifications listed may be added after
award only as provided in the labor standards contract clauses
(29CFR 5.5 (a) (1) (ii)).


----------------------------------------------------------------


The body of each wage determination lists the classification
and wage rates that have been found to be prevailing for the
cited type(s) of construction in the area covered by the wage
determination. The classifications are listed in alphabetical
order of "identifiers" that indicate whether the particular
rate is a union rate (current union negotiated rate for local),
a survey rate (weighted average rate) or a union average rate
(weighted union average rate).

Union Rate Identifiers

A four letter classification abbreviation identifier enclosed
in dotted lines beginning with characters other than "SU" or
"UAVG" denotes that the union classification and rate were

W91151-16-C-0042

prevailing for that classification in the survey. Example: PLUM0198-005 07/01/2014. PLUM is an abbreviation identifier of the union which prevailed in the survey for this classification, which in this example would be Plumbers. 0198 indicates the local union number or district council number where applicable, i.e., Plumbers Local 0198. The next number, 005 in the example, is an internal number used in processing the wage determination. 07/01/2014 is the effective date of the most current negotiated rate, which in this example is July 1, 2014.

Union prevailing wage rates are updated to reflect all rate changes in the collective bargaining agreement (CBA) governing this classification and rate.

Survey Rate Identifiers

Classifications listed under the "SU" identifier indicate that no one rate prevailed for this classification in the survey and the published rate is derived by computing a weighted average rate based on all the rates reported in the survey for that classification.  As this weighted average rate includes all rates reported in the survey, it may include both union and non-union rates. Example: SULA2012-007 5/13/2014. SU indicates the rates are survey rates based on a weighted average calculation of rates and are not majority rates. LA indicates the State of Louisiana. 2012 is the year of survey on which these classifications and rates are based. The next number, 007 in the example, is an internal number used in producing the wage determination. 5/13/2014 indicates the survey completion date for the classifications and rates under that identifier.

Survey wage rates are not updated and remain in effect until a new survey is conducted.

Union Average Rate Identifiers

Classification(s) listed under the UAVG identifier indicate that no single majority rate prevailed for those classifications; however, 100% of the data reported for the classifications was union data. EXAMPLE: UAVG-OH-0010 08/29/2014. UAVG indicates that the rate is a weighted union average rate. OH indicates the state. The next number, 0010 in the example, is an internal number used in producing the wage determination. 08/29/2014 indicates the survey completion date for the classifications and rates under that identifier.

A UAVG rate will be updated once a year, usually in January of each year, to reflect a weighted average of the current negotiated/CBA rate of the union locals from which the rate is based.

----------------------------------------------------------------

## WAGE DETERMINATION APPEALS PROCESS

1.) Has there been an initial decision in the matter? This can be:

*  an existing published wage determination
*  a survey underlying a wage determination
*  a Wage and Hour Division letter setting forth a position on
   a wage determination matter
*  a conformance (additional classification and rate) ruling

On survey related matters, initial contact, including requests for summaries of surveys, should be with the Wage and Hour Regional Office for the area in which the survey was conducted because those Regional Offices have responsibility for the Davis-Bacon survey program. If the response from this initial contact is not satisfactory, then the process described in 2.) and 3.) should be followed.

With regard to any other matter not yet ripe for the formal process described here, initial contact should be with the Branch of Construction Wage Determinations.  Write to:

    Branch of Construction Wage Determinations
    Wage and Hour Division
    U.S. Department of Labor
    200 Constitution Avenue, N.W.
    Washington, DC 20210

2.) If the answer to the question in 1.) is yes, then an interested party (those affected by the action) can request review and reconsideration from the Wage and Hour Administrator (See 29 CFR Part 1.8 and 29 CFR Part 7). Write to:

    Wage and Hour Administrator
    U.S. Department of Labor
    200 Constitution Avenue, N.W.
    Washington, DC 20210

The request should be accompanied by a full statement of the interested party's position and by any information (wage payment data, project description, area practice material, etc.) that the requestor considers relevant to the issue.

3.) If the decision of the Administrator is not favorable, an interested party may appeal directly to the Administrative Review Board (formerly the Wage Appeals Board).  Write to:

    Administrative Review Board
    U.S. Department of Labor
    200 Constitution Avenue, N.W.
    Washington, DC 20210

4.) All decisions by the Administrative Review Board are final.

===============================================================

    END OF GENERAL DECISION

## ACCOUNTING AND APPROPRIATION DATA

AA: 0212014201420200000131322542AEH0152  M.0011217.4.1      6100.9000021001
COST CODE: A2AEH
AMOUNT: $230,792.85
CIN GFEBS001087042100010: $230,792.85

## *Takeover Agreement*

This Takeover Agreement ("Agreement") is entered into by and between Capitol Indemnity Corporation ("Surety") and the United States of America, acting by and through the Department of the Army, Mission and Installation Contracting Command, Fort Hood ("Owner"), and is made effective as of the 13th day of May, 2016.

### *Recitals*

WHEREAS, Redstick, Inc. ("Contractor") and Owner entered into a written contract dated September 27, 2014, in the original amount of $1,945,694.00, Contract No. W91151-14-C-0061, (the "Original Contract"), whereby Contractor agreed to construct certain improvements on a project known as "Project No. AD004720P, Repair Iron Horse Gym Building 37017" (the "Project"), in accordance with the terms and provisions of the Original Contract;

WHEREAS, as required by federal law and under the terms of the Original Contract, Contractor and Surety executed and delivered to Owner a Performance Bond No. 60097881 ("Performance Bond") and a Payment Bond No. 60097881 ("Payment Bond"), each dated October 2, 2014 and in the penal sum of $1,945,694.00;

WHEREAS, Contractor was declared in default and terminated by Owner by letter dated March 28, 2016, and Owner has called upon Surety to fulfill its obligations as surety under the terms of the Performance Bond;

WHEREAS, the Surety has agreed to complete the remaining work with a Completion Contractor in accordance with the terms of the Performance Bond and this Agreement;

WHEREAS, the Original Contract, including the Work to be performed and the Contract Balance, defined herein, have been assigned a new contract number, _____.

NOW, THEREFORE, in consideration of the agreements and undertakings hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which being hereby acknowledged, Owner and Surety agree as follows:

### *Agreement*

1.  Surety hereby undertakes to cause the performance of the Work, including correcting patent defects, a list of which is set forth in Exhibit "A" of this Agreement and any latent defects in the work performed by the Principal, to be completed in accordance with each and every one of the terms, covenants and conditions of the Original Contract, including all modifications thereto, and agrees to be bound thereby. The parties agree that the list at Exhibit "A" is not a final list of such defects. The Owner reserves the right to add patent defects to the list in its Final Punchlist if it establishes the existence of such patent defects. Conversely, the Surety does not agree that any of the items on Exhibit "A" constitute patent defects and shall have the right to have items removed from the list that it demonstrates are not patent defects, by mutual consent of the parties to this Agreement. Owner acknowledges that Surety, by its execution of this Agreement, is acting in its capacity as the surety for Contractor in making arrangements for the performance and completion of the Work under the Original

Contract, and not as a completing contractor, and that Surety is not assuming any obligations or liabilities beyond those set forth in the Performance Bond. As to the completion of the Work under the Original Contract, except as otherwise provided in this Agreement, Surety is entitled to all rights, title and interest of Contractor in and to the Original Contract in all respects as if Surety were the original party to the Original Contract. The term "contractor" as used in the Original Contract shall be deemed, after the effective date of this Agreement, to refer to Surety rather than to Contractor. Except as otherwise provided in this Agreement, Owner shall have all rights, obligations and responsibilities under the Original Contract with respect to Surety, to the same extent and effect as if Surety had executed the Original Contract initially instead of Principal and Principal had not defaulted and been terminated.

2.   Owner acknowledges that Surety will subcontract the performance of the Work under the Original Contract to 3B-S General Contracting as completion contractor ("Completion Contractor"), and Owner hereby consents to Surety's designation of this entity as Completion Contractor to complete the Work under the Original Contract, provided the Completion Contractor meets the qualification requirements of the Owner imposed by the Original Contract for those entities performing the type of work contemplated by the Original Contract. Completion Contractor shall be a subcontractor to the Surety, and no contractual relationship shall exist between Owner and any Completion Contractor pursuant to this Agreement. Surety may satisfy the required insurance obligations under the Original Contract by providing evidence of the required insurance coverage carried by Completion Contractor, with Surety being named as an additional insured under the policy or policies. Surety shall have no obligation to furnish any insurance under the Original Contract or this Agreement as long as Completion Contractor provides such insurance coverages.

3.   Owner represents and warrants to Surety that as of the date of this Agreement:

   a.   The adjusted amount of the Original Contract, including all approved change orders entered into by Principal and Owner through Amendment of Solicitation/Modification of Contract No. P00005, is the sum of $2,307,928.53;

   b.   Contractor has been paid the sum of $2,077,135.68 by Owner; and

   c.   The "Contract Balance" (including unpaid retainage) shall be defined as the sum of $230,792.85 [subsection (a) minus subsection (b)].   The Original Contract Amount shall be increased by the value of proposed Change Orders submitted by the Surety and subsequently approved by Owner, except that the Original Contract Amount shall not be increased by the value of any future Change Orders necessitated by the deficient work of the Principal or Completion Contractor(s) except to the extent the Owner would otherwise be responsible for paying for such work pursuant to the terms of the General Contract.

   d.   Pursuant to the Original Contract, Owner is withholding an amount of $230,792.85 which is 10% of the Original Contract.   Owner shall release these funds in the manner required by the Original Contract, provided that Owner may use the contract balance to offset any liquidated damages to be paid by surety in the event that the project is finished after the completion date established in Item 5.   No liquidated damages will be withheld through the completion date of August 15, 2016.

4.   Owner agrees that the entire Contract Balance is dedicated to and will be applied to the completion of the Work under the Original Contract pursuant to this Agreement. Surety will submit monthly pay estimates to the Owner. The payment of the remaining Contract Balance to Surety shall be made in accordance with the terms of the Original Contract as to the time, amount and method of payment. Surety agrees to spend its own funds (subject to the penal sum cap described below) as may be necessary from time to time to pay for the performance of the Work under the Original Contract by Completion Contractor in the event that the Contract Balance is insufficient, with any such payments being credited against the penal sum of the Performance Bond. Owner agrees that it will not assess any liquidated or other damages against progress and/or retainage payments from the Contract Balance payable to Surety under this Agreement alleged to have occurred on or before the effective date of this Agreement. All payments under this Agreement shall be made payable to Surety and shall be sent to Surety at the following address, unless and until Owner is notified in writing of any different address:

Capitol Indemnity Corporation
Ms. Pat Framke
1600 Aspen Commons
Middleton, Wisconsin 53562

5.   Surety shall substantially complete the Work on or before the 15th of August, 2016 (the "Completion Date") and shall finally complete the final punch list on the Work within ten (10) working days of Surety's receipt of Owner's final punch list provided that the additional work in the Final Punchlist can be performed in ten (10) working days.

6.   Insofar as the Owner has any right, title or interest therein, Owner agrees that Surety and its Completion Contractor shall have the right to use, without charge, any of the equipment, materials and appurtenances furnished or supplied by Contractor which may be stored on or about the premises of the Project site or materials which may have been fabricated for use in connection with the Original Contract, whether or not presently upon the Project site.

7.   Surety will not have any employees or other representatives on the Project site on a daily basis other than its Completion Contractor or designated representative. Surety hereby authorizes Gary Bierhalter of Bierhalter & Associates and/or Jeff Barlow of Completion Contractor to be its designated representative (the "Authorized Individual") solely for the purposes set forth in this paragraph. The Authorized Individual will represent Surety in dealing with Owner on day-to-day construction issues with respect to the Project. The Authorized Individual shall also have the authority to negotiate and sign change orders for extra work requested or required by Owner without Surety's prior written approval, provided the change order does not exceed $1,000 and Completion Contractor is given additional time to perform the change order. If the change order exceeds $1,000, or no additional time is given to Completion Contractor to perform the change order, then Surety's prior written approval is required to negotiate the change order and the final change order must be signed by Surety and not the Authorized Individual. If the total of all of the approved change orders exceeds the sum of $5,000, then Surety, not the Authorized Individual, must approve in writing all additional or subsequent change orders regardless of the amount of each such change order. The Authorized Individual

*L & B 09895/0032/L1118933.DOC/     Takeover Agreement - Page 3*

43

has no authority to negotiate deductive change orders, credits, back charges or net deductions from the Original Contract or the Contract Balance of any nature whatsoever without Surety's prior written approval. Any agreements with respect to any warranty work of Contractor or corrective work as a result of any latent defects in the work performed by Contractor shall require the written approval of Surety.

8.   The authority of the Authorized Individual to deal directly with Owner may be revoked by Surety on three (3) days' written notice to Completion Contractor and Owner. In the event any dispute arises between Owner and Completion Contractor, or Completion Contractor is alleged to be or is in actual default under the terms of the Original Contract or this Agreement, Owner shall give Surety written notice thereof within forty-eight (48) hours of Owner's knowledge of same.

9.   The total liability of Surety under this Agreement and the Performance Bond for the performance of the Work, after the expenditure of the Contract Balance if paid by Owner to Surety hereunder, is limited to and shall not exceed the penal sum of the Performance Bond in the amount of $1,945,694.00. All payments properly made by Surety for the performance of the Work under the Original Contract shall be credited against the penal sum of the Performance Bond. Nothing in this Agreement constitutes a waiver of such penal sum as the maximum limitation of Surety's liability under the Performance Bond. In the event that Surety expends the penal sum of the Performance Bond, after the expenditure of the Contract Balance if paid by Owner to Surety hereunder, in performance of the Work under the Original Contract and this Agreement, Owner agrees that Surety shall have no further liability or obligation to Owner under the Performance Bond, this Agreement, the Original Contract or otherwise, and Surety may immediately cease performance without further obligation to Owner.

10.  In no event shall Owner withhold any of the Contract Balance from Surety because of or on account of any claims, liens, suits or demands by any persons or entities furnishing or alleging to have furnished labor and/or materials to the Project. The Payment Bond shall remain in full force and effect in accordance with its terms and provisions. The total liability of Surety under the Payment Bond is limited to and shall not exceed the penal sum of the Payment Bond in the amount of $1,945,694.00. All payments properly made by Surety under the Payment Bond shall be credited against the penal sum of the Payment Bond. Nothing in this Agreement constitutes a waiver of such penal sum or an increase in the liability of Surety under the Payment Bond. Owner recognizes that Surety may be liable to unpaid suppliers and subcontractors of Principal. Owner agrees to make no representations or promises of payment to these suppliers and subcontractors and to refer all inquiries to Surety.

11.  Owner agrees that it will not acknowledge or honor any claim or charges against the Contract Balance by Contractor or any alleged assignees, successors, creditors or transferees of Contractor, or any other party making claim to any such proceeds or balances, without the prior written consent of Surety, or except by order of a court of competent jurisdiction after due notice to Surety. Surety shall defend (at Surety's expense, using its counsel), indemnify and hold harmless Owner from and against any and all claims of every description made by any other party, excluding the principal, making claim to any such proceeds arising as a consequence of payments made by Owner

44

APPX44

to Surety under this Agreement. The Surety's defense and indemnity obligations to the Owner for such claims shall be limited to the penal amount of the Payment Bond.

12. This Agreement constitutes the entire agreement between the parties and supersedes any and all prior discussions, agreements, arrangements and/or understandings by and between them, all of which are merged into this Agreement. This Agreement shall not be changed, amended or altered in any way except in writing and signed by both Owner and Surety. Owner and Surety acknowledge that there have been no oral, written or other agreements of any kind as a condition precedent to or to induce the execution and delivery of this Agreement. Any written or oral discussions conducted prior to the effective date of this Agreement shall not in any way vary or alter the terms of this Agreement. Except as herein modified, all terms and conditions of the Original Contract shall remain unchanged and in full force and effect. The Recitals to this Agreement shall be considered substantive terms and conditions and not mere recitals in the interpretation of this Agreement.

13. **(a) Surety expressly reserves all prior rights, equitable liens and subrogation rights under the contract, performance bond, payment bond, at law or in equity, as well as Surety's own rights dating back to the execution of the bond, to include, but not be limited to, those rights and remedies that accrued prior to former Contractor's Termination, Contractor's default, and those rights and remedies that may accrue during the completion of the contract, including any and all claims of overpayment and/or payments in violation of the terms of the Contract to the Contractor arising under the subject Contract. No waiver of such rights is agreed to or implied, regardless of any provisions of this Agreement to the contrary and Owner acknowledges Contractor's assignment of such claims and causes of action to Surety.**

**(b) To the extent necessary, if Surety elects to pursue any claims of former contractor arising under the contract in its own name and for its own benefit, Owner hereby acknowledges and consent to the assignment of all of former contractor's claims to Surety under the contract, to the extent permitted by law, including but not limited to, the right of Surety to assert, in its own name and for its own benefit, all of former Contractor's and any of Contractor's subcontractor's claims for equitable adjustment to the Contract Price or time under the subject Contract, whether arising prior to or after the default.**

14. This Agreement is solely for the benefit of Owner and Surety. Owner and Surety do not intend by any provision of this Agreement to create any rights in any third-party beneficiaries, nor to confer any benefit upon or enforceable rights under this Agreement or otherwise upon anyone other than Owner and Surety. Specifically, Owner and Surety acknowledge that nothing in this Agreement shall extend or increase the rights of any third-party claimants or the liabilities or obligations of Surety under the Bonds.

15. This Agreement shall be governed by and controlled by applicable federal law and is performable in the federal jurisdiction encompassing Bell County, Texas.

16. Any notices which are required to be given by the terms of this Agreement shall be sent

L & B 09895/0032/L1118933.DOC/     *Takeover Agreement - Page 5*

via certified mail, return receipt requested, to the following persons and addresses:

**Owner:**

Department of the Army
Mission and Installation Contracting
Command – Fort Hood
1001 761st Tank Battalion Avenue, Rm W103
Attn: Neta Singley
Fort Hood, Texas 76544-5025

**Surety:**

Capitol Indemnity Corporation
Ms. Pat Framke
1600 Aspen Commons
Middleton, Wisconsin 53562

With a copy to:

Gary R. Bierhalter
Bierhalter & Associates
11827 Thoreau Dr.
Montgomery, TX 77356

And to:

Roy White
Langley & Banack, Inc.
745 East Mulberry Avenue, Suite 900
San Antonio, TX 78212

17.     This Agreement shall be binding upon the parties and their respective successors and assigns.

18.     In the event that one or more provisions of this Agreement shall be declared to be invalid, illegal or unenforceable in any respect, unless such invalidity, illegality or unenforceability shall be tantamount to a complete failure of consideration, the validity, legality and enforceability of the remaining provisions contained in this Agreement shall not in any way be affected or impaired thereby.

19.     It is understood and agreed by Owner and Surety that this Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

20.     This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original.

*L & B 09895/0032/L1118933.DOC/        Takeover Agreement - Page 6*

46

IN WITNESS WHEREOF, the parties have executed this Agreement and made effective as of the date indicated above, and each of the undersigned personally represent and warrant that they have the full right, power and authority to execute this Agreement on behalf of the respective parties.

**OWNER:**

UNITED STATES OF AMERICA, acting
by and through the Department of the Army

By: *Neta a Singley*

Its: *Contracting Officer*

STATE OF TEXAS         §
                                   §

COUNTY OF BELL       §

This instrument was acknowledged before me on this 24 day of May, 2016, by Neta A. Singley, Contracting Officer of the Department of the Army on behalf of the United States of America.

*Sheila Burns*

Notary Public, State of Texas

**SURETY:**

Capitol Indemnity Corporation

By: *[signature]*

Authorized Representative

STATE OF WISCONSIN     §
                                         §

COUNTY OF DANE        §

This instrument was acknowledged before me on this 23 day of May, 2016, by an authorized representative of Capitol Indemnity Corporation, a Wisconsin corporation, on behalf of said corporation.

*[signature]*

Notary Public, State of Wisconsin

L & B 09895/0032/L1118933.DOC/    Takeover Agreement - Page 7

47

APPX47

# Iron Horse Gym                    EXHIBIT A

| Room Number | Action to be taken |
|---|---|
| Mechanical Room | All 1/2" flex needs to be strapped.<br>BX Cable needs to be replaced with flex.<br>1/2" conduit is separated, someone turned screw out.<br>Pump needs to be hooked up by electrician.<br>All conduit on fire, couplings needs to be red. |
| Roof | Support for piping on roof needs to be secured together.<br>Guy wires need tightening.<br>Label on electrical box.<br>Label on disconnect box for mini split.<br>Two covers on dead loop to be installed back and on mass notification antenna.<br>Straps on top of yellow plumbing, needs to be anchored to braces.<br>Gutter on south side of building. |
| Women's bathroom, entrance | GFCI's not working.<br>Broken floor tile. |
| Men's bathroom, entrance | Broken floor tile. |
| Entrance | Check fire panel to see if there are 4 or 8 zones; 4 are labeled.<br>Caulk around opening for sliding window inside entrance. |
| Gym | Basketball goals are disconnected, needs power to goals to raise/lower.<br>Missing keys for power on basketball goals.<br>Floor surface below rubber flooring will be floated to ensure a flat, smooth look.<br>    Remove rubber flooring, float floor, and re-install rubber flooring. |
| Men's Locker Room | Replace ceiling tiles in men's locker room.<br>Investigate/repair leaks in men's locker room.<br>Air register to be replaced in men's locker room.<br>Sauna to be cleaned in men's locker room. |
| Women's Locker Room | Replace ceiling tiles in women's locker room.<br>Investigate/repair leaks in women's locker room.<br>Diffuser corner bent, not set.<br>Sauna to be cleaned in women's locker room. |
| Room 105 | Door frame not replaced.  Hardware failing because of this.  Rework hardware.<br>Incorrect door installed, replace. |
| Room 107 | Incorrect door installed, replace.<br>Door frame not replaced as required. |

48

# Iron Horse Gym                    EXHIBIT A

| Room Number | Action to be taken |
| --- | --- |
| Room 109 | Tile lifting/cracking, repair/replace. |
| Room 110 | Sweep debris. |
| Room 111 | Incorrect door frame, replace.<br>Remote for mini split is not installed.  Red Stick signed for it.  Owner to verify.<br>Remove/replace tiles in certain areas.<br>Wax floors.<br>Missing sprinkler head in closet. |
| Hallway | Duct Detector must be in accessible location; 6ft. or  lower. |
| Rom 114 | Threshold needs to be painted yellow.<br>Repair ceiling tile cut into 2 pieces around fire penetration. |
| Room 115 | Threshold needs to be painted yellow.<br>Anchors are missing at top of window frame.<br>Clean floor.<br>Replace 4x8 panel where gouge is located. |
| Room 116 | Leak on ceiling tile. |
| Mezzanine | Add outlet from one underneath. |

49

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | | 1. CONTRACT ID CODE | PAGE OF PAGES | |
|---|---|---|---|---|
| | | J | 1 | 2 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | | 5. PROJECT NO.(If applicable) |
|---|---|---|---|---|
| P00003 | 30-Sep-2016 | 0010870421 | | AD004720P |

| 6. ISSUED BY                    CODE | W91151 | 7. ADMINISTERED BY (If other than item 6)                    CODE | W91151 |
|---|---|---|---|
| MISSION AND INSTALLATION CONTRACTING<br>MISSION CONTRACTING OFFICE (MCO)<br>BUILDING 1001,  ROOM W103<br>1001 761ST TANK BATTALION AVE<br>FORT HOOD TX 76544-5025 | | DIRECTORATE OF PUBLIC WORKS<br>ENGINEERING DIVISION (CONTRACTING SECTION)<br>BLDG 4610, ENGINEER DRIVE<br>FORT HOOD TX 76544-5055 | |

| 8. NAME AND ADDRESS OF CONTRACTOR  (No., Street, County, State and Zip Code) | | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|
| CAPITOL INDEMNITY CORPORATION<br>PATRICIA FRAMKE<br>1600 ASPEN COMMONS<br>MIDDLETON WI 53562-4718 | | |
| | | 9B. DATED (SEE ITEM 11) |
| | X | 10A. MOD. OF CONTRACT/ORDER NO.<br>W91151-16-C-0042 |
| CODE   1D3W0 | FACILITY CODE  1D3W0 | X | 10B. DATED  (SEE ITEM 13)<br>01-Jun-2016 |

| 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS |
|---|

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offer ☐ is extended, ☐ is not extended.

Offer must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended by one of the following methods:
(a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers.  FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

| 12. ACCOUNTING AND APPROPRIATION DATA (If required) |
|---|

| 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS.<br>IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14. |
|---|

| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO:  (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
|---|---|
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(B). |
| X | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:<br>FAR 52.211-13 Time Extensions |
| | D. OTHER (Specify type of modification and authority) |

E. IMPORTANT:   Contractor ☐ is not,  ☒ is required to sign this document and return ___1___ copies to the issuing office.

| 14. DESCRIPTION OF AMENDMENT/MODIFICATION  (Organized by UCF section headings, including solicitation/contract subject matter where feasible.) |
|---|

Modification Control Number:    kf48c105161074

Reference conversation and email correspondence between Contractor, COR and Contracting Officer.

A. This modification is issued to change the Period of Performance (POP) from 1 Jun 2016 - 15 Aug 2016 to 1 Jun 2016 - 31 Oct 2016.

B. Contractor's Statement of Release: In consideration to the modification agreed to herein as complete and equitable adjustment for the POP change, the Contractor hereby releases the Government from any and all liability under the contract or equitable adjustment attributable to such facts or circumstances giving rise to the change of the delivery date.

C. All other terms and conditions remain unchanged.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) |
|---|---|
| | CONSTANCE D. PETITJEAN / PROCUREMENT ANALYST<br>TEL:   254-533-                                 EMAIL:  constance.d.petitjean.civ@mail.mil |

| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
|---|---|---|---|
| _____<br>(Signature of person authorized to sign) | | BY _Constance D. Petitjean_<br>(Signature of Contracting Officer) | 30-Sep-2016 |

| EXCEPTION TO SF 30<br>APPROVED BY OIRM 11-84 | 30-105-04 | STANDARD FORM 30 (Rev. 10-83)<br>Prescribed by GSA<br>FAR (48 CFR) 53.243 |
|---|---|---|

1

SECTION SF 30 BLOCK 14 CONTINUATION PAGE

**SUMMARY OF CHANGES**

SECTION 00010 - SOLICITATION CONTRACT FORM

DELIVERIES AND PERFORMANCE

The following Delivery Schedule item for CLIN 0001 has been changed from:

| DELIVERY DATE | QUANTITY | SHIP TO ADDRESS | DODAAC |
|---|---|---|---|
| POP 01-JUN-2016 TO 30-SEP-2016 | N/A | DIRECTORATE OF PUBLIC WORKS<br>DPW CONSTRUCTION COR<br>4612 ENGINEER DRIVE<br>FORT HOOD TX 76544<br>FOB:  Destination | W45NQ9 |

To:

| DELIVERY DATE | QUANTITY | SHIP TO ADDRESS | DODAAC |
|---|---|---|---|
| POP 01-JUN-2016 TO 31-OCT-2016 | N/A | DIRECTORATE OF PUBLIC WORKS<br>DPW CONSTRUCTION COR<br>4612 ENGINEER DRIVE<br>FORT HOOD TX 76544<br>FOB:  Destination | W45NQ9 |

(End of Summary of Changes)